1
2

**THEO TORRES**
California State Bar No. 324059
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**

3
4

225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467

5
6

Facsimile: (619) 687-2666
Email: Theo_Torres@fd.org

7

8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cr-02503-GPC |
| Plaintiff | Hon. Gonzalo P. Curiel |
| v. | January 12, 2024 2:30pm |
| FRANCISCO ORTIZ, | **Mr. Ortiz's Motion to Exclude DNA Evidence** |
| Defendant | |

16

17

## I.    INTRODUCTION

18

19

20

21

22

23

24

25

Police failed to incriminate Mr. Ortiz when they first analyzed the DNA in this case. In hindsight, this failure was not surprising: the touch-DNA sample clocked in at a paltry 450 picograms,[1] ten percent below the minimum threshold at which the manufacturers of the test kit could even justify analysis. And the sample was highly complex to boot; the analysts suspected that at least five people had contributed to the mixture. The true number of contributors was likely higher, but the lab was not equipped to analyze more than five.

26

27

Unsurprisingly, their initial analysis failed outright. The computer

28

---

[1] A picogram is one trillionth of a gram.

conducting the analysis crashed for lack of onboard memory after trying for hours to spit out a readable result.

Undeterred, the analysts tried again. This time, they reduced the complexity of the sample—using a 15-second injection time rather than the 24-second injection time they had initially used. Even with this simplification, the computer still struggled to give an answer, crunching the numbers for two and a half hours before finally yielding a result. This ad hoc process pointed to Mr. Ortiz as the second of five genetic contributors to the DNA sample.

The central problem is simple: the San Diego Police Department Crime Lab has never conducted an analysis of this kind, involving five-plus contributors with vanishingly small amounts of genetic material of poor quality tested in two improvised phases. This lack of internal validation renders the lab's conclusions about the mixture inherently unreliable. Their own data says as much: of the known five-person samples they tested for validation, almost half were misidentified. And they have no experience or proficiency whatsoever in handling six or seven-person mixtures.

Understandably, no court has ever admitted a DNA analysis quite like this. For reasons unknown, the analysts in this case ignored the red flags that the failed first analysis raised and altered their approach until they got a result that incriminated Mr. Ortiz. In doing so, they disregarded their own lab's validation studies and the limits of the science itself. As a result, the DNA analysis in this case fails under *Daubert*, Rule 702, and Rule 403.

## II.    DNA TESTING AND INTERPRETATION

Deoxyribonucleic acid, or DNA, is a double-stranded molecule that coils to form the characteristic double helix, and is found in all cells possessing a

nucleus.[2] John Butler, *Fundamentals of Forensic DNA Typing* ("*Fundamentals*"), 19 (2010).[3] Forensic DNA typing examines certain locations, or loci (singular: locus), on the DNA strand. The DNA typing technique at issue in this case is short tandem repeat (STR) testing. STR typing measures how many times a short piece of DNA repeats at each of the tested loci; the number of repeats is known as an allele. *Id* at 148. An individual's genetic type, or profile, is the compilation of his or her alleles at each locus tested. At each locus, an individual possesses two alleles: one allele inherited from each biological parent. *Id* at 25. Thus, an individual's DNA profile is simply a list of two numbers—known as a genotype—per locus examined.

A person can inherit the same allele—*i.e.* same number of repeats—at a locus from both their biological parents (*e.g.* 12, 12). This means the person has a homozygous genotype (or, is a homozygote) at that locus. Alternatively, an individual can inherit two different alleles—two different numbers—at a locus from their parents (*e.g.* 12, 16). This means the individual has a heterozygous genotype (or, is a heterozygote) at that location.

The DNA testing process proceeds via a series of steps: extraction, quantitation, amplification, genetic analysis, and interpretation. The first step in generating a DNA profile from a sample is extraction, where the analyst attempts to isolate the DNA and separate it from all other cellular

---

[2] Most cells, with the exception of red blood cells, possess nuclei. When it is in the nucleus, DNA is tightly packaged into two sets of 23 chromosomes; one set of 23 chromosomes is inherited from each parent. Sperm and egg cells possess only one set of 23 chromosomes each; when they unite, the resulting embryo possesses the full set of 46 chromosomes. *Fundamentals* at 23.

[3] John Butler's textbooks on DNA analysis – including *Fundamentals of Forensic DNA Typing* and *Advanced Topic in Forensic DNA Typing: Interpretation* – are considered authoritative in the field of forensic DNA analysis. They are both used in forensic science education, as well as cited in laboratories' protocols.

material and debris. *Id.* at 99. After extraction of the DNA, the sample is quantitated, *i.e.*, the total amount of DNA present in the sample is estimated. *Id.* at 114.

Based on the estimated amount of DNA present, some portion of the extracted DNA is then amplified. Amplification is a process by which DNA is copied at targeted loci many times over, generating on the order of a billion copies.[4] *Id.* at 125–26. During the amplification process, the targeted DNA may not amplify for a number of reasons, including a) if there is only a small amount of it present to begin with;[5] b) if it is degraded (i.e. broken into pieces due to environmental exposure or other stressors); or c) if there are inhibitors (such as some fabric dyes or excess salts) present in the sample. *Id.* at 68.

When targeted DNA does not amplify, that genetic information is lost in downstream steps; this loss of genetic information is known as allelic dropout. *Id.* at 222. The term "allelic dropout" specifically refers to a scenario in which only one of a DNA contributor's two alleles at a given locus is detected by the DNA typing process.[6]

The post-amplification sample consists of large numbers of only the copied alleles, which can then be separated on an instrument called a genetic analyzer so that each allele can be distinguished and notated. *Id.* at 175. The result of this process is a series of peaks on a graph, called an electropherogram. *Id.* at 194.

Interpretation comes next. Traditionally, this step was undertaken by

---

[4] Amplification is conducted via a technique called polymerase chain reaction, commonly notated as PCR.

[5] Quantitation gives a preliminary estimate of whether the amount of DNA in the extract falls into this low level range. However, a seemingly sufficient total amount of DNA may be comprised of low levels of DNA from multiple contributors; this is not something that can be discerned from the quantitation step, which does not distinguish between contributors. Rather, it only reports the total amount of DNA present.

[6] There can also be loss of both alleles at a given location, which is called locus dropout.

4

an analyst. The analyst would interpret the electropherogram, generating a genetic profile for the evidence sample.

Part of this interpretation process involves determining whether peaks on the produced graph represent "real" DNA or artifacts of the testing process. Each "real" DNA peak corresponds to an allele present in the sample and the height of each peak roughly corresponds to how much of that allele is present—a taller peak indicates more of a particular allele present. When testing a single source evidence sample (i.e. a sample originating from one individual), two peaks of roughly equivalent height should be observed at each locus where the contributing individual is a heterozygote (i.e. possesses two different alleles). At loci where the contributor is a homozygote (i.e. possesses two of the same allele), one relatively high peak should be observed, because the two alleles "stack" on top of one another. *See, e.g.,* Figure 1, below.



*Figure 1. An electropherogram showing ideal, single-source DNA data at four hypothetical loci. Note that at Locus 3, where the DNA contributor is a homozygote (possesses two "8" alleles), his two alleles "stack" on top of one another, resulting in a single peak on the electropherogram. At each of the other three loci, where the contributor is a heterozygote (i.e. possesses two different alleles), two peaks are observed. Figure from Butler, Advanced Topics in Forensic DNA Typing: Interpretation, 11, Fig. 1.5 (2014).*

Under this traditional scheme, *after* the evidence sample is fully

interpreted, the analyst then compares the resulting profile to the profile that the analyst developed from the reference sample. If the analyst determines that one of the reference profiles "matches" or "cannot be excluded from" the evidence profile, the analyst calculates a rarity statistic to contextualize the significance of the match or inclusion. Statistical calculations are an essential part of the interpretation methodology, giving the trier of fact a means of assessing the possibility that the inclusion is "merely a coincidence and that the two samples did not actually come from the same person." *United States v. Porter*, 618 A.2d 629, 632 (D.C. 1992).

Indeed, without these probability statistics, evidence of a DNA inclusion is not admissible in court. *Id.* at 640. This is because "it would not be scientifically justifiable to speak of a match as proof of identity in the absence of underlying data that permit some reasonable estimate of how rare the matching characteristics actually are." National Research Council, *The Evaluation of Forensic DNA Evidence, Committee on DNA Forensic Science: An Update* 192 (1996) [*NRC II*]; *see also* National Research Council, *DNA Technology in Forensic Science* (1992) [*NRC I*] at 74 ("To say that two patterns match, without providing any scientifically valid estimate (or at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless").

**A. Difficulties posed by mixture deconvolution**

For these reasons, single-source DNA samples have long been held up as the gold standard for forensic science. Countless cases have been solved— and innocent people exonerated—based on analysis of this kind. A semen sample taken from a rape survivor, for instance, can be matched with unparalleled precision to the perpetrator.

But samples found at crime scenes often contain DNA from multiple people. Such a DNA profile representing two or more contributors is termed

a DNA mixture. *Fundamentals*, at 320. An analyst knows that they are dealing with a DNA mixture, versus a single source sample, if they observe more than two alleles at two or more loci, or if loci with only two alleles display significant peak height imbalance.[7] John Butler, *Advanced Topics in Forensic DNA Typing: Interpretation* ("*Interpretation*"), 129 (2014). Unlike the kind of straightforward analysis involved in interpreting a high-quality, single-source DNA profile, mixtures are often ambiguous. Accordingly, the process of interpreting them can be highly subjective.

Some mixtures may be resolved or 'deconvoluted' by an analyst into individual sources based on the relative amounts of DNA contributed by each source. Generally, if a single individual contributes more than three quarters of the DNA in the mixture (i.e. 3:1 mixture ratio), that person is deemed the 'major contributor', and their DNA profile may be isolated and compared to reference samples.[8] The profile of the minor contributor(s) – particularly if there is more than one – cannot be isolated in this way.

The complex mixture in Mr. Ortiz's case falls into the largest danger zone for mixture deconvolution with the highest risk of error. Studies have shown that attempts at interpretation of such complex and low-level DNA data can lead to widely divergent results from one analyst to the next, even among analysts in the same laboratory applying the same set of protocols. *See* Dror and Hampikian, Subjectivity and bias in forensic DNA mixture interpretation, *Sci. & Justice*, 51(4), 204–208 (2011);[9] NIST Interlaboratory

---

[7] Two alleles from the same contributor should be roughly the same height, within a degree of tolerance (called a "peak height ratio" (PHR)). If the height of two allelic peaks observed at a given locus are not within this predetermined tolerance—i.e. they are "imbalanced"—this is a sign that they actually originate from two people rather than one.

[8] Analysts use the height of allelic peaks on the electropherogram as a proxy for how much DNA is originating from each contributor.

[9] In this study, 17 examiners from one government laboratory were provided a mixed DNA profile from a sex assault case and asked to

Mixture Interpretation Study 2013 ("MIX13");[10] and forerunner NIST mixture studies (e.g. MIX05).

There are two important consequences of allele sharing. One

One of the biggest complicating factors in the interpretation of complex mixture data is the potential for allele sharing. *Interpretation* at 153. As described above, when an individual has two of the same allele at a locus (*i.e.* is a homozygote), that person's alleles "stack" on top of one another and present as a single peak on the electropherogram. Similarly, when multiple contributors to a DNA mixture possess the same allele at a locus, those alleles also "stack" and present as a single peak. *See, e.g.,* Figure 2, below. This is known as allele stacking or allele sharing.

There are two important consequences of allele sharing. One consequence is that "allele sharing makes accurately deducing the number of contributors to a mixture challenging – and the challenge only grows with each additional contributor to a DNA mixture." *Interpretation* at 169.[11] If an

interpret the profile and compare it to a suspect's reference profile. The original caseworking analyst had determined that the suspect could not be excluded as a contributor to the mixture. The 17 examiners came to a variety of conclusions: 1 concluded "cannot exclude," 12 "excluded," and 4 deemed the results "inconclusive". Among other things, these results underscore the subjectivity of complex mixture interpretation.

[10] The NIST MIX13 study was the largest study of its kind, broadly assessing the accuracy, reproducibility, and repeatability of mixture interpretations among and across laboratories. Analysts from one hundred and eight laboratories took part, and 46 states had at least one laboratory participate; the participants were from a mix of federal, state, and local labs. As one of the study's leading authors has noted, "[d]ue to the number of laboratories responding and the federal, state, and local coverage obtained, this MIX13 interlaboratory study can be assumed to provide a reasonable representation of current U.S. forensic DNA lab procedures across the community." Dr. Michael Coble, Interpretation Errors Detected in a NIST Interlaboratory Study on DNA Mixture Interpretation in the U.S. (July 22, 2015) ("MIX13 Interpretation Errors") (emphasis in original), available at
https://www.nist.gov/system/files/documents/2016/11/22/interpretation_errors_detected_in_a_nist_interlab_study_on_dna_mixture_interpretation_in_the_us_mix13.coble_.crim1_.pdf

[11] For example, studies have shown that, because of allelic stacking, more than 75% of known four-person mixtures would be misclassified as two- or

analyst cannot accurately determine how many contributors there may be in a mixture, the analyst cannot accurately interpret the mixture. Because the analyst cannot accurately conclude that, for example, a true four-person mixture is not instead a three-person mixture, she necessarily cannot deduce the genotype combinations that accurately account for the data under her three-person hypothesis. Put simply, she will always be one person short. Inaccurate interpretation of the mixture impacts not only decisions to include or exclude individuals as potential contributors to the mixture, but also the associated statistical analysis.



*Figure 2. A hypothetical mixture which (a) exhibits only three alleles at a locus (and is thus suggestive of a two person mixture), (b) is actually comprised of three low level contributors plus a single higher level contributor, whose alleles stack on top of one another. Figure from Interpretation, at 160, Fig. 7.1.*

A second consequence of allele sharing is that it becomes increasingly

three- person mixtures based on the maximum number of alleles detected at any given locus. Paoletti et al., Empirical Analysis of the STR Profiles Resulting from Conceptual Mixtures, *J Forensic Sci*, 1361-66 (2005). *See also* Coble et al., Uncertainty in the Number of Contributors in the Propose New CODIS Set, *For Sci Int'l: Genetics*, 19: 207-211 (2015).

difficult to deconvolute a mixture into individual contributors. While some level of allelic sharing will undoubtedly occur in any DNA mixture, there is no objective way to determine whether and to what extent allele sharing is occurring at any given locus in a complex DNA mixture profile. This is true because there is no way to tell whether an observed peak comes from one contributor, or actually is the combined low level contributions of two or more individuals. *See, e.g.,* Figure 2 above.

Ultimately, "allele sharing from multiple contributors lead[s] to greater uncertainty in the specific genotype combinations that can be reliably assumed." *Interpretation* at 177. The risk rises significantly with each new contributor to the sample. Butler et al., DNA Mixture Interpretation: *A NIST Scientific Foundation Review* (2021) at 31, available at https://nvlpubs.nist.gov/nistpubs/ir/2021/NIST.IR.8351-draft.pdf. And, as Dr. Butler has warned, "[w]hen there is a high degree of interpretation uncertainty from an evidentiary sample, it makes little sense to try and draw conclusions . . . and expect those conclusions to be reliable." *Interpretation at 177.*

## B. Probabilistic genotyping and STRmix

Enter probabilistic genotyping. Probabilistic genotyping ("PG") software purports to interpret DNA mixtures that are too complex and ambiguous for human DNA analysts to resolve. Proponents of PG assert that any attempt to deconvolute complex and ambiguous mixtures calls for the application of complex statistical modeling. Given the extreme complexity of the model, manual analysis would be both difficult and time-intensive.

Consequently, developers looked to software as an alternative to manual interpretation, leveraging computer power to reduce errors and increase speed. At bottom, PG software applies algorithms that have been written and edited by that software's developers to model biology and

attempt to deconvolute complex mixtures. The PG program's proprietary algorithms incorporate a large number of assumptions coded by the developers about testing behaviors, allelic drop-out and drop-in rates, and "stochastic effects" like stutter.

This new method of interpretation represents a paradigm shift within forensic DNA analysis:

> PG represents a significant change in the way that complex DNA profiles are being interpreted. The paradigm of DNA testing since its earliest days has been to first attempt to exclude an individual as a possible contributor and then, if that effort fails, to determine what fraction of a pool of alternative suspects would similarly fail to be excluded. Exclusion could sometimes be as simple as finding that a suspect had an allele that was not found in an analysis of an evidence sample. PG approaches differ, however, because they intrinsically accept that test results may be incomplete. Instead, these approaches focus less on how rare a person's DNA profile is and more on how consistent the test results are with the prosecution's theory of a case relative to individual defense theories.

S. Ford and D. Krane, The Dawning of a New Era in DNA Profiling, *The Champion*, at 42 (2018).

Another feature of this paradigm shift is the use of a different statistical approach to deconvolution that departs from calculations of rarity and instead focuses on the idea of statistical confidence. Specifically, PG programs output a likelihood ratio—*not* the random match probability used in meat-and-potatoes DNA analysis. "A likelihood ratio does not tell you one theory is right and an alternative is wrong. Instead, it provides an estimate of how confident one should be in one theory relative to another. Neither the numerator (the prosecution explanation of the DNA result) ["Hp"] nor the

denominator (generally the defense explanation of the DNA result) ["Hd"], let alone the ratio, can be empirically compared to a knowable right answer." *Id.* at 44.

Some PG programs are open source, meaning they are available to be tested and are subject to public scrutiny. Some are entirely automated, taking human guesswork out of the equation. But STRmix—the software in Mr. Ortiz's case—relies on an amalgam of proprietary algorithms to model biology, a series of subjective judgments by the human analyst, and internal validation data produced by the DNA testing laboratory (here, the San Diego Police Department's) to deconvolute until-now uninterpretable mixtures and generate likelihood ratios (LRs) for persons of interest.

Human judgment is still key. Specifically, the human analyst decides 1) which peaks from the electropherogram[12] are "real" DNA and thus should be uploaded to STRmix; 2) decides how many contributors are in the mixture (a highly challenging and subjective exercise, and one that is impossible to perform with any certainty, as discussed above); and 3) defines the competing hypotheses that the STRmix program will consider when calculating the LR. Getting these questions right is critical to reaching a reliable result.

In turn, the resulting LR for comparison of a suspect's profile to the range of genotype combinations possible is not a statement that his profile is the best fit for the data. Nor is it a "prediction[] about the fraction of alternative suspects who have a particular genotype. Rather, [it] tell[s] us how much better a set of test results supports one theory of a case relative to an alternative one." S. Ford and D. Krane, The Dawning of a New Era in DNA Profiling, *The Champion*, 44 (2018).

---

[12] STRmix enters at the interpretation stage of DNA testing; the prior steps (extraction through genetic analysis, resulting in an electropherogram) proceed as described above.

The relevance of this information, in turn, hinges on the "theories" or "hypotheses" tested. "Even the simplest PG software currently available can only evaluate the consistency of a test result with hypotheses that explicitly assume a specific number of contributors and a specifically articulated chance that drop-out and drop-in has occurred." *Id.* The output of the program is only as reliable as these human-made assumptions and articulations provided as inputs. As a result, even under ideal conditions, STRmix still depends on individual analysts to make these first-order judgment calls.

And even with perfect human judgment, STRmix has its limits. The President's Council of Advisors on Science and Technology ("PCAST") reviewed the existing published scientific literature and observed that "current studies have adequately explored only a limited range of mixture types." *Forensic Science in the Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods* at 80, available at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.

Because of these empirical limits, PCAST found that foundational validity for PG programs like STRmix is restricted to a certain range: "DNA mixtures of 3 individuals in which the minor contributor constitutes at least 20 percent of the intact DNA in the mixture . . . ." PCAST Report at 82. "Beyond this approximate range (i.e. with a larger number of contributors or where the person of interest makes a lower than 20% contribution to the sample), however, there has been little empirical validation." PCAST, *An Addendum to the PCAST Report on Forensic Evidence in Criminal Courts* 8 (Jan. 2017), http://perma.cc/25RE-NU7B.

This number-of-contributors question is not a mere technicality. Controlled experiments have proven that errors in determining the number

of contributors can falsely incriminate innocent people. Take the MIX13 study as an example. Dr. Michael Coble, Interpretation Errors Detected in a NIST Interlaboratory Study on DNA Mixture Interpretation in the U.S. (July 22, 2015) ("MIX13 Interpretation Errors") (emphasis in original), available at https://www.nist.gov/system/files/documents/2016/11/22/interpretation_errors_detected_in_a_nist_interlab_study_on_dna_mixture_interpretation_in_the_us_mix13.coble_.crim1_.pdf.

In this experiment, the participating analysts were provided with the same five mock case scenarios and the same set of five evidentiary DNA profiles to interpret. The ground truth was known by the study's authors for each case used in the study, but not by the analysts. As a result, the study authors were able to assess whether the analysts falsely included or excluded suspects.

One of the profiles, in particular, underscores the danger associated with number-of-contributors errors. Case 5 involved a four person mixture which, because of significant allele sharing, could be erroneously interpreted as a two person mixture. *Id.* at 29, 30; Figure 2. Due to this error, *69% of participants falsely included an innocent individual in this mixture. Id.* at 34. And excluding the analysts who simply did not reach a firm conclusion, a staggering 92% of participants implicated an innocent person.

This experiment underscores the importance of getting the number right. STRmix's proprietary algorithms are only as reliable as the human judgment guiding it. No amount of computing power can overcome first-order mistakes in determining the function's inputs.

## III.   THE ANALYSIS IN MR. ORTIZ'S CASE

This is just such a case. On January 26, 2020, Mr. Ortiz was arrested after police found a gun and eighteen grams of meth hidden under the seat

of a car in which he was one of four passengers. The facts of this stop and search are recounted in greater detail in his motions to suppress and the resultant evidentiary hearings. In the time since, undersigned counsel has retained the services of Dr. Dan Krane, a professor of biology and expert in probabilistic genotyping. Dr. Krane's report is cited throughout this motion as Exhibit C.

On the government's end, forensic analysis began a month after Mr. Ortiz's arrest. The Deputy District Attorney assigned to his case submitted a DNA request to the San Diego Police Department Crime Lab on February 27. Ex. A (Laboratory Work Request).

Criminalist Adam Dutra oversaw the project. Understandably, precise details about his thought process and decision-making are unknown. But he etched handwritten bench notes on materials provided in discovery, shedding light on some of what transpired.

He started by swabbing the gun for DNA. That swab yielded 450 picograms of DNA. Ex. B (Amplification Worksheet). A picogram is one trillionth of a gram. For scale, consider slicing a grain of rice into fifty million pieces—the slices would still be slightly heavier than the DNA here. California Metals Coalition, *What is One Nanogram?* available at http://www.metalscoalition.com/uploads/2/4/3/5/24359359/what_is_one_nan ogram.pdf.

Amplification was the next step. Perhaps due to the smaller-than-recommended sample size, Dutra decided to run the sample as a 24-second injection. This decision marked a deviation from the San Diego Police Department Crime Lab's internal validation studies. Those materials had purported to validate analysis of five-person DNA mixtures only at 15-second injection times. Ex. C (Statement of Dr. Dan Krane) at 4–5.

1   Validation is a key concept here. In light of STRmix's difficulties
2   analyzing complex mixtures, crime labs are subject to internal controlled
3   testing. These tests involve analyzing samples of *known* DNA mixtures—
4   composed of volunteers at the lab itself. "[D]epending on the particular
5   functions and applications of the system and its planned use in the
6   laboratory, each laboratory will need to perform internal studies to
7   demonstrate the reliability of the software and any potential limitations."
8   American Academy of Forensic Sciences Standards Board (ASB) Standard
9   018, First Ed., Validation Standards for Probabilistic Genotyping Systems
10  (draft) (2017), available at https://asb.aafs.org/wp-
11  content/uploads/2017/05/Std_018_Ballot_01.pdf.

12  When conducting internal validation, "[d]ata should be selected to test
13  the system's capabilities and to identify its limitations". SWGDAM,
14  Guidelines for the Validation of Probabilistic Genotyping Systems, at Sec. 4.
15  "A primary purpose for validation studies then is to push the system until it
16  fails in order to understand the potential limitations – to define the scope and
17  range of method (and interpretation) reliability." Butler, J. M. Validation
18  Overview, *presented at* the NIST DNA Analysis Webinar Series: Validation
19  Concepts and Resources – Part 1 (Aug. 6, 2014), available at
20  https://www.nist.gov/document-2861.

21  The San Diego crime lab has provided much of its internal validation
22  materials through the discovery process. Relevant here, the lab included
23  eleven known five-person mixtures in its internal testing. Ex. C at 5. Those
24  five-person mixtures, however, were all conducted with 15-second injection
25  times. *Id.* Further underscoring the difficulty of this task, *five of these eleven*
26  *known mixtures were misidentified. Id.* Perhaps in light of these difficulties,
27  the lab has never attempted to validate mixtures containing six or more
28  people. *Id.*

16

It is thus unclear why Dutra chose a 5-person mixture with a 24-second injection time for the Ortiz case. Perhaps it was because the 450 picogram sample clocked in below the 500 picogram threshold recommended for use by the Globalfiler test kit. *Id.* at 8. By using a longer injection time, Dutra would possibly obtain a more legible final product. We cannot know for certain at this juncture.

What happened next is comparatively clearer: STRmix tried to analyze the sample, but failed. The computer gave up midway through the analysis, giving the analyst an "out of memory error." Ex. C at 2; *see also* Bates 4948. Put simply, the sample was too complicated for the hardware's onboard memory.

Nonetheless, this 24-second injection at least produced an electropherogram. Ex. C at 4; *see also* Bates 4945–4947. This electropherogram contained two 11-peak loci. *Id.* Peak counts this high—if not the result of stochastic effects—would indicate that this was a mixture of at least six DNA profiles, not five. *Id.* Considering the above-described problems of allele sharing and dropout, the true number of contributors could be even greater.

In light of these peaks, it's unclear when or why Dutra identified the sample as only a five-person mixture. The bench notes for the 15-second injection only say "[t]his injection (15s) was run through STRmix as a 5 person mixture." Ex. C at 2; *see also* Bates 4939. After examining Dutra's work, Dr. Krane could find "[n]o notes . . . that describe how the number of contributors to the sample were determined or what data was considered as part of that process." *Id.*

In any event, Dutra built this assumption into the 15-second injection. "It took nearly 2.5 hours to complete with over 20 million iterations of the MCMC algorithm and resulted in STRmix™ producing a 3,141-page report

(with more than 3,000 pages genotype weights)." *Id.* at 6. The report could not exclude Mr. Ortiz as the second of five DNA profiles on the gun, with a likelihood ratio of $5.42 * 10^8$. In other words, it attributed 144 picograms of the 450-picogram sample to Mr. Ortiz. The other four contributors were not identified.

Once reaching this result, the analysis ended. Dutra did not attempt to interpret the sample as a six person mixture. Ex. C at 7. Nor could he have done so for the six-person interpretation, since such an interpretation would be disallowed by the lab's policy. *Id.*

## IV.   ARGUMENT

This analysis is first and foremost inadmissible for one simple reason: this crime lab has not even attempted to validate the process used here, involving a sub-500 picogram sample with at least five contributors. This lack of validation extends to the perplexing decision to use a 24-second injection, resulting in a failed and too-complicated analysis before then pivoting to a 15-second injection. We simply do not know whether this ad hoc procedure can yield a reliable result.

Beyond this unknown, what we *do know* about the lab's massive error rate in analyzing five-person mixtures provides another basis for exclusion. Their own validation materials and the existing scientific literature all point in the same direction: that STRmix cannot reliably analyze samples involving more than four contributors.

And finally, the "likelihood ratio" statistic is inadmissible under Federal Rule of Evidence 403. Jurors are unlikely to understand that the LR does not express a statistical "match" to Mr. Ortiz. Instead, it expresses a Bayesian multiplier of prior—and fundamentally unknown—odds that Mr. Ortiz handled this gun. Such a concept is certain to confuse jurors without college coursework in statistics.

**A. The DNA analysis here is fundamentally unreliable because the San Diego Police Department Crime Lab did not validate the ad hoc process it used to incriminate Mr. Ortiz.**

    i.   <u>Empirical validation is a necessary predicate to the admissibility of probabilistic genotyping evidence.</u>

Federal Rule of Evidence 702 allows for the admission of opinion testimony by a qualified expert if and only if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of such evidence bears the burden of establishing that its proffered expert testimony is relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *United States v. Rincon*, 28 F.3d 921, 923 (9th Cir. 1994). Here, that means the government must establish that "the reasoning or methodology underlying the testimony is scientifically valid and that it can properly be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (internal citations omitted).

1    Among the factors the Court can consider in determining whether the

2    government has carried its burden are (1) whether a scientific theory or

3    technique can be (and has been) tested; (2) whether the theory or technique

4    has been subjected to peer review and publication; (3) the known or potential

5    rate of error and the existence and maintenance of standards controlling the

6    technique's operation; and (4) whether the technique is generally accepted.

7    *Daubert*, 509 U.S. at 593-94. These factors are "meant to be helpful, not

8    definitive, and the trial court has discretion to decide how to test an expert's

9    reliability as well as whether the testimony is reliable, based on the

10   particular circumstances of the particular case." *Primiano v. Cook*, 598 F.3d

11   558, 564 (9th Cir. 2010) (internal cites omitted).

12    The cases that have considered the admissibility of DNA evidence make

13   clear that every step of the DNA testing process must satisfy *Daubert* review.

14   *See United States v. Shea*, 957 F. Supp. 331, 337 (D.N.H 1997) (noting that,

15   under *Daubert*, "each logical step in the expert's analysis must be

16   scientifically valid").

17    The Ninth Circuit has identified three steps: (1) processing of DNA

18   samples to produce DNA prints; (2) comparison of the prints to see whether

19   there is a "match"; and (3) estimating the statistical significance of the match.

20   *See United States v. Chischilly*, 30 F.3d 1144, 1156 (9th Cir. 1994), *overruled*

21   *on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014).

22   Failure to use a reliable method for *any* of these steps precludes admission of

23   the evidence. *Id.*; *see also Dodge*, 328 F.2d at 1222; *United States v. Morrow*,

24   374 F. Supp. 2d 51, 61 (D.D.C. 2005) ("The fact that we have taken judicial

25   notice of the reliability of the technique of DNA profiling does not mean that

26   expert testimony concerning DNA profiling is automatically admissible

27   under *Daubert*.") (quoting *United States v. Martinez*, 3 F.3d 1191, 1197 (8th

28   Cir. 1993)).

20

Before conclusions grounded in a particular methodology can be admitted into evidence, the methodology must be supported by "appropriate validation." *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known.").

This principle applies with full force to probabilistic genotyping software programs like STRmix. The President's Council of Advisors on Science and Technology (PCAST) specifically advises that "[w]hen considering the admissibility of testimony about complex mixtures (or complex samples), judges should ascertain whether the published validation studies adequately address the nature of the sample being analyzed (e.g., DNA quantity and quality, number of contributors, and mixture proportion for the person of interest)." PCAST, *An Addendum to the PCAST Report on Forensic Science in Criminal Courts* 9 (2017); *accord* Katherine Kwong, *The Algorithm Says You Did It: The Use of Black Box Algorithms to Analyze Complex DNA Evidence*, 31 Harv. J.L. & Tech. 275, 277-82 (2017) at 300 (stating that "courts should rigorously examine whether a given algorithmic system has been validated for a particular type of evidence analysis and refuse to admit evidence that lacks demonstrated validity for a given mixture type").

Of particular relevance here, a probabilistic genotyping system must be validated on mixtures containing a given number of contributors before the system can be applied to such mixtures. *See* Scientific Working Group on DNA Analysis Methods (SWGDAM) Guidelines for Validation of Probabilistic Genotyping Systems § 4.1.6.3 ("The number of contributors evaluated should be based on the laboratory's intended use of the software. A range of contributor numbers should be evaluated in order to define the limitations of the software."). This is because the difficulty of reliably interpreting samples

21

increases when the number of contributors increases, or when the proportion of the sample attributable to a minor contributor decreases. PCAST, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 80-81 (2016). Moreover, "an error in determining how many individuals' DNA were present within a mixture could have rippling effects through subsequent stages of analysis, affecting decisions [by the algorithm] about differentiating signal from noise and distinguishing which DNA came from which individual." Kwong, *supra*, at 291.

A lab must validate a program on mixtures containing a particular number of contributors to determine whether the program "works" on such mixtures and define the program's limitations as applied. *See* PCAST Report at 81 (noting that scientific validity has only been established within the specific range for which experimental evidence of validity is available); *People v. Hillary*, Ind. No. 2015-15, slip op. at 8 (St. Lawrence Cty. Ct., N.Y., Aug. 26, 2016) (holding that "the lack of internal validation by the New York State Police crime lab . . . precludes the use of the STRmix results"). And even "a laboratory's satisfaction with its validation results does not" necessarily demonstrate that "the principles underlying the procedures are valid." *People v. Collins*, 49 Misc. 3d 595, 613, 15 N.Y.S.3d 564, 576 (N.Y. Sup. Ct. 2015). Instead, the Court must independently determine that the internal validation is adequate to cover the procedure used in any particular case.

> ii.  The ad hoc process here was not validated, either here in San Diego or anywhere else in the country.

Mr. Ortiz's case does not satisfy this key criterion. Because the San Diego crime lab never attempted to validate 5-person-plus mixtures at 24-second injection times, no one knows whether such an analysis is reliable. This lack of data is especially serious in a case like this, in which the 24-second electropherogram output appears to have governed the number-of-

contributors parameter used in the latter-day 15-second injection. This ad hoc process is unsupported by the data and the crime lab's own policies.

One court in the Ninth Circuit has addressed an eerily similar fact pattern. In *United States v. Williams*, San Francisco forensic scientists analyzed touch-DNA recovered from the scene of a double murder. 382 F. Supp. 3d 928, 929 (N.D. Cal. 2019). The first analysis failed to identify the defendant as a contributor. *Id.* at 932. And, based on the allele peaks, the analyst "concluded that at least five people contributed to the mixture." *Id.*

The second analysis was different. Using their newly validated probabilistic genotyping software, police arrived at a result that incriminated the defendant as one of four—not five—contributors. *Id.* at 933–34. The likelihood ratio clocked in at 270,000 to one— "very strong" support for the prosecution hypothesis. *Id.* at 934.

The district court excluded the evidence entirely. The problem there was the same as the problem here: the authorities could not "reliably conclude that only four individuals contributed DNA to the mixture at issue." *Id.* at 937. Although there were warning signs that the mixture came from more than four people, the analyst in that case made the judgment call to analyze the sample as a four-person mixture. This "foundational issue" resulted in exclusion. *Id.* at 938.

The similarities to Mr. Ortiz's case abound. Like in *Williams*, the incriminating result was only obtained after the lab first failed to analyze the DNA sample. Like in *Williams*, the lab here did not have enough raw DNA to meet the minimum threshold recommended for use with GlobalFiler. *Id.* at 937. Like in *Williams*, there were more alleles detected in the prior, failed analysis than there were in the later analyses. *Compare id.* with Ex. C (Statement of Dr. Krane) at 4 (noting that the initial electropherogram indicated two 11-peak loci while two later analyses displayed fewer). And like

in *Williams*, the lab here was not validated to analyze the number of contributors suggested by these initial electropherograms—five in *Williams* and six here. The conclusion here should be the same.

**B. Even if this ad hoc process had been tested, the lab's own statistics demonstrate that it is incapable of reliably identifying five-person mixtures in the best of circumstances.**

Even if Dutra had stuck to protocol, his result would still be unreliable. This is true because the San Diego crime lab's own validation studies strongly suggest that it cannot reliably analyze mixtures involving more than four people.

These statistics are stark. Relevant here, the lab included eleven known five-person mixtures in its internal testing. Ex. C at 5. Further underscoring the difficulty of this task, *five of these eleven known mixtures were misidentified. Id.* Four of the eleven samples registered as four-person mixtures. Another registered as either a three or four-person mixture. *Id.* This suggests an error rate of 45%, although Dr. Krane notes that the sample size is small. *Id.*

These statistics are not surprising. In a 2018 inter-laboratory examination of validation studies, almost two-thirds of known five-person mixtures were misidentified by the labs. Ex. C at 3. The results were even more extreme for six-person mixtures: a full one hundred percent of known six-person mixtures were misclassified. *Id.* Other studies had similarly stark failure rates: a 2015 study using the GlobalFiler test kit used in Mr. Ortiz's case had a misclassification rate of between 86 and 94%. *Id.*

One potential tool to address this problem is called VarNOC (short for "variable number of contributors"). VarNOC is a STRmix feature that allows the program "to compare two separate deconvolutions when the number of

contributors is ambiguous[.]" Ex. D (SDPD STRmix v2.6 Performance Check) at 8. This function can help an analyst determine alternative likelihood ratios for different possible numbers of contributors.

But the lab did not use this feature here. That may be because "deconvolution attempts assuming five contributors resulted in 'out of memory' errors before the deconvolution finished." Ex. C at 6. The lab is silent as to the cause of this error—it perhaps suggests that the lab's computers cannot process 5-person mixtures with VarNOC.

The math here is straightforward. Based on the lab's own validation materials and the empirical literature, it is more likely than not that the sample here has been misclassified. It could be a four or six-person mixture masquerading as a five-person mixture. It could even be a seven-person mixture. Because neither STRmix nor the analysts can reliably make this determination, the evidence fails the *Daubert* standard.

*Williams* is again instructive. Relying on the same studies cited here (as well as Dr. Krane's testimony), the district court observed that "five-person mixtures are underestimated as four-person mixtures at a troubling rate—a rate much higher than that associated with four-or three-person mixtures." 382 F. Supp. 3d at 936. These figures weighed against admissibility there, just as they do here.

And like here, the *Williams* lab had also "demonstrated an inability to distinguish five-person mixtures from four-person mixtures." *Id.* at 937. While the 45% error rate in analyzing five-person mixtures in the San Diego lab is lower than the 100% error rate in San Francisco, it still earns a decidedly failing grade.

To be sure, there is one difference between *Williams* and this case: in *Williams*, the lab had at least attempted to analyze five-person samples in its internal validation studies. The results of that attempt were failure, but

helped to delineate the outer bounds of the software's capabilities. Based on this data, the lab disclaimed any proficiency in analyzing samples of five or more people.

The San Diego lab is different. None of the internal validation materials indicate that the lab has ever attempted to study—let alone validate—how its analysts fare with six-person mixtures. So, while the relevant players in *Williams* knew just how bad the lab was at identifying five-person mixtures, we have no such track record for the San Diego lab and six-person mixtures.

This gap is key. Based on the electropherograms in Mr. Ortiz's case, there is ample support for the idea that this was a six-plus person DNA mixture. But, because the lab "made no six-person mixtures for" its validation materials, there is no way to determine the actual error rate. The literature suggests such an error rate would be close to 100%, but the ground truth remains a mystery.

Ultimately, "the number of contributors is a foundational part of every calculation" STRmix makes. 382 F. Supp. 3d at 937. Because the lab here has not done the work necessary to reliably calculate that number, the proffered DNA evidence is irreparably unreliable. It should thus be excluded under *Daubert*.

### C. Even if the lab's methods were valid, the "likelihood ratio" statistic poses an unacceptable risk of misleading the jury.

This analysis presents one last issue: the statistic used to communicate Dutra's conclusions. That statistic—called the likelihood ratio—is incapable of being correctly communicated and comprehended to a jury of laypeople. For this reason, it should be excluded under Rule 403.

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules

exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted).

Nowhere is this risk more acute than DNA. Statistical evidence concerning DNA runs "the risk that such evidence will inordinately distract the jury from or skew its perception of other" evidence with less sheen. *Chischilly*, 30 F.3d at 1156. *See also United States v. Johnson*, No. 15-cr-00565 VEC, Dkt. 57 at 1 (S.D.N.Y. June 7, 2016) ("The fact that the results obtained from the use of the [probabilistic genotyping program] FST can be devastating to a criminal defendant increases the need of the Court to be diligent about FST's reliability prior to admitting FST results into evidence."); *McDaniel v. Brown*, 558 U.S. 120, 136 (2010) ("Given the persuasiveness of [DNA] evidence in the eyes of the jury, it is important that it be presented in a fair and reliable manner."); *Government of Virgin Islands v. Byers*, 941 F. Supp. 513, 527 (D.P.R. 1996) ("For the lay person . . . it is easy to conceive that this same science that can reveal the genetic secrets of the living, the dead, and the yet unborn is potent enough to solve the most perplexing crime. There is something very primal about DNA and genetic science that lends itself to a posture of 'mythic infallibility.'"); John M. Butler*, Advanced Topics in Forensic DNA Typing: Methodology* 542 (1st ed. 2012) ("There is a considerable aura to DNA evidence. Because of this aura it is vital that weak evidence is correctly represented as weak or not presented at all.") (internal quotes omitted).

Here, Rule 403's balancing tests tilts against the likelihood ratio offered against Mr. Ortiz. This is true for four independent reasons.

**First**, the likelihood ratio does not mean what it appears to mean. As set forth above, the likelihood ratio does not signify that the odds are 542,000,000 to 1 that Mr. Ortiz's DNA was on the gun. Rather, it signifies that the DNA evidence from the gun is 542,000,000 times more likely to be

observed *if* the DNA came from Mr. Ortiz and four unknown, unrelated contributors than if it came from five random people. To actually translate this likelihood ratio into a conclusion about the probability that Mr. Ortiz contributed to the mixture, you must multiply the ratio by the prior odds, based on other evidence, of Mr. Ortiz's contribution.

But this translation is simpler in theory than in practice. For one thing, jurors are unlikely to appreciate the distinction between what the likelihood ratio seems to mean and what it really means. *See* National Institute of Justice, Forensic Technology Center of Excellence, *Communication of Likelihood Ratios in Accordance with SWGDAM Recommendations*, Oct. 18, 2018, at 57, *available at* https://forensiccoe.org/webinar/swgdam-likelihood-ratios/ ("A jury may not see the difference, but it may give them a false understanding."); *Byers*, 941 F. Supp. at 527 n.45 ("Jurors sometimes tend to confuse statistical evidence. One study found, for example, that jurors mistakenly reasoned that if a defendant's blood type is found in only ten percent of the population, there is a ninety percent chance that he is guilty.") (citation omitted). And even if jurors grasp the concept, they have no practical way to quantify the prior odds so that the multiplication can be reliably performed. *See* National Resource Council, *The Evaluation of Forensic DNA Evidence*, *supra*, at 132 ("It is difficult even for experts to express complex nonscientific evidence in terms of quantitative odds[.]"). For this reason, jurors are likely to—falsely—believe it is 542,000,000 times more likely that Mr. Ortiz contributed to the sample than not.

**Second**, the apparent precision of the likelihood ratio is misleading. Researchers have shown time and again that jurors place particular faith in evidence they perceive to be "scientific," in the sense that it is not subjective. *See* John W. Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability and Form*, 71 Or. L.

Rev. 349, 367 & n.81 (1992) ("There is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have particularly persuasive effect"). But the seeming exactitude of the likelihood ratio masks the reality that analysis of complex mixtures is extremely imprecise and depends on a host of subjective assumptions. *See* PCAST Addendum at 8–9; Kwong, *supra*, at 290. Indeed, it is an open secret that different probabilistic genotyping software programs—all of which purport to do exactly the same thing—yield wildly different likelihood ratios for a given set of inputs. *See* Harish Swaminathan et al., *Four Model Variants Within a Continuous Forensic DNA Mixture Interpretation Framework: Effects on Evidential Inference and Reporting,* PLoS ONE 13(11) (Nov. 20, 2018), https://doi.org/10.1371/journal.pone.0207599 (finding significantly different results among different probabilistic genotyping systems that analyzed the same DNA samples). As illustrated in Mr. Ortiz's case, even the same software will yield drastically different results when iteratively examining the same DNA sample—even when using the *exact same sample with the same injection.*

**Third**, the magnitude of the likelihood ratio is impossible for laypeople to contextualize and evaluate. What should a juror make of the opinion that DNA evidence is 540,000,000 times more likely to be observed if Mr. Ortiz and four unrelated people contributed to a mixture than if five unrelated people contributed? How do each of these statistics compare in significance to likelihood ratios in the trillions, quadrillions or octillions? *See, e.g., United States v. Valdez,* Case No. 18-cr-00608 JD, Dkt. 45, at 9 (N.D. Cal. Feb. 6, 2019) (discussing analyst's opinion, based on probabilistic genotyping, that likelihood ratio was 4.25 quadrillion). And how can lay jurors conscripted into service for one case alone be expected to answer these questions, even with the assistance of a vigorous expert cross?

**Fourth,** Dutra's proffered opinion that the likelihood ratio provides "very strong support" for the inclusion of Mr. Ortiz as a contributor to the mixture is empirically unmoored. The opinion is based on a verbal scale the forensic DNA community made up to address the inaccessibility of likelihood ratios to finders of fact. The point of the scale is to tell factfinders how much weight to assign to the outputs of probabilistic genotyping systems. *See* Forensic Technology Center of Excellence, *Communication of Likelihood Ratios*, *supra*, at 35 ("The scale is intended to assist analysts in describing the strength of the evidence to individuals in the criminal justice system."). But likelihood ratios do not purport to state the odds in favor of a particular hypothesis. Accordingly, an analyst's effort to translate a ratio into an expression of support for a hypothesis is irreconcilable with the enterprise of probabilistic genotyping itself. If probabilistic genotyping cannot state the odds, neither can the analyst who uploads the data into the probabilistic genotyping system.

## V.    CONCLUSION

For these reasons, this Court should exclude the results of the DNA analysis under *Daubert*, Rule 702, and Rule 403.

Respectfully submitted,

DATED: December 8, 2023        */s/ Theo Torres*

Federal Defenders of San Diego, Inc.
Attorneys for Mr. Ortiz
Email: Theo_Torres@fd.org