**THEO TORRES**
California State Bar No. 324059
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Email: Theo_Torres@fd.org

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>FRANCISCO ORTIZ,<br><br>Defendant | Case No. 21-cr-02503-GPC<br><br>Hon. Gonzalo P. Curiel<br><br>April 19, 2024 10:00am<br><br>**Mr. Ortiz's Post-Hearing Briefing in Support of His Motion to Exclude DNA Evidence** |

## I.   INTRODUCTION

Despite three days of in-the-weeds scientific testimony, the legal question before this Court is narrow: Has the government proven by a preponderance of the evidence that Adam Dutra reliably determined that the DNA sample here was composed of five—and only five—contributors? All parties agree that reliably making this first-order determination is necessary to obtain a valid result from STRmix on the back end. As the Court put it, "it's basically garbage in, garbage out[.]" Tr. 366.

The answer is no. While he is no doubt earnest and accomplished, Mr. Dutra has not demonstrated that he can beat the long odds set for him on this question. The San Diego Police Department Crime Lab's own internal

1

validation study and the broader empirical literature both point squarely in the same direction: that error rates are astronomical when analyzing high-complexity samples like the one in Mr. Ortiz's case. For these reasons, Mr. Ortiz's *Daubert* motion should be granted.

## II.  ARGUMENT

### A. The number-of-contributors determination relies upon subjective human judgment, resulting in massive error rates for high-complexity DNA mixtures.

Mr. Ortiz does not challenge the general reliability of probabilistic genotyping as a science, nor the more specific reliability of STRmix as a software. He instead is concerned with Mr. Dutra's number-of-contributors *input* into STRmix, an input that relies, in part, on "subjectivity." Tr. 88. Everyone agrees that STRmix "depends upon an accurate count of contributors to be able to perform reliably." Tr. 365.

To be sure, *Daubert* tolerates some degree of subjectivity. If a crime lab can demonstrate that their analysts can use subjective methods to obtain accurate and reliable results, then *Daubert*'s gatekeeping function would be satisfied. In the realm of probabilistic genotyping, for instance, multiple experimental studies confirm that human analysts can reliably determine the number of contributors to less complex samples. *See, e.g.*, Ex. L (Uncertainty in the number of contributors in the proposed new CODIS set, Coble et al.) at 115[1] (documenting very low error rates for mixtures containing fewer than four contributors).

But this confidence collapses with more complex mixtures. In the Coble paper, for example, 60.99% of known five-person mixtures presented as four-or-fewer contributors, while 85.99% of known six-person mixtures presented

---

[1] Mr. Ortiz's pagination is based on the continuous pagination contained in his electronically submitted exhibits, visible in the bottom-right corner of the page.

as five-or-fewer. *Id; see also* Tr. 453. In the Hicklin paper, roughly five percent of analysts could correctly identify five-person mixtures, while none were able to precisely identify a six-person mixture. Ex. M (Variation in assessments of suitability and number of contributors for DNA Mixtures, Hicklin et al.) at 125; Tr. at 289–90. These same trends were apparent in the exhibits submitted by the government. Gov't Ex. 7 (PCAST Response) at 12 (noting that all six-person mixtures in this study were underestimated). No party has identified any experiment or study indicating an error rate inconsistent with this concerning trend.

> **B. Mr. Dutra's methods do not solve the problems identified in the scientific literature, as demonstrated by the San Diego lab's 45% mischaracterization rate in the validation study.**

Mr. Dutra, by contrast, testified that he "knew" the sample here contained five contributors. Tr. 129, 130. He knew as much because he did not rely on the simple "allele count[ing]" method employed in the Coble paper. Tr. 132. Instead, Mr. Dutra looked to "stutter and peak height imbalance" to discount the extra alleles in Mr. Ortiz's case that suggested a six-person mixture. Tr. 132.

But Mr. Dutra did not explain exactly *how* analysts use this information to improve their number-of-contributors calculations. Dr. Krane, for his part, stated that "peak height information is of very little, if any, utility" for "higher-order" mixtures. Tr. 394. While peak height imbalance can be useful for two and three-person mixtures, Dr. Krane "[did not] think peak height information is useful for a five- or a six-person mixture." Tr. 396.

The data supports Dr. Krane's view. Empirically speaking, peak height imbalance does not appear useful for real-world samples. Even setting aside the allele-counting studies like Coble, all of the available literature indicates that the vast majority of five-person-plus samples are underestimated by in-

3

the-trenches analysts. Tr. 560–61. Mr. Dutra conceded that the real-life lab analysts in the Bright paper and the Hicklin paper underestimated the true number of contributors between two-thirds and one hundred percent of the time for mixtures containing five or more people. *Id.* This result persisted even though the analysts were accounting for artifacts like stutter and peak-height imbalance. Tr. 561.

The San Diego crime lab's own validation materials bear this out. As Mr. Dutra admitted, his lab's validation study documented a 45% underestimation rate in determining the number of contributors to eleven known five-person samples. Tr. 45, 169. Mr. Dutra attributed this poor performance to two issues: First, he noted that an inexperienced-but-well-credentialed analyst, Dr. Melissa Strong, performed the validation exercises. Tr. 574–75. And second, he claimed that some of the samples "were designed to be more challenging" to interpret. Tr. 588.

The first issue is attributable to the lab, not Mr. Ortiz. *Daubert* requires that the evidence's proponent prove that the methods are "scientifically valid" and have been "properly applied . . . to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). Scientific validity, in turn, "requires that it be shown, based on empirical studies, to be *repeatable, reproducible,* and *accurate.*" Ex. Q (PCAST Report) at 419 (emphasis in original). The lab can and should expect courts to scrutinize their validation studies; if they use an inexperienced or inept analyst to conduct the validation study, then they are stuck with those results under *Daubert*. It is not the job of judges to assume that the more experienced analysts will perform satisfactorily.

And there is no good reason to believe Mr. Dutra is materially better than Dr. Strong was. He has not been tested on his ability to correctly determine the number of contributors to high-complexity samples. By his

own admission, *no analyst* at the lab has ever been tested on five-person mixtures. Tr. 437. Instead, the analysts use "single-source and two-person mixtures for the . . . proficiency tests." Tr. 438. They do not practice on three or four-person mixtures, let alone five or six. Unsurprisingly, then, the San Diego analysts who participated in the Bright et al. response to PCAST were part of a poorly performing cohort. Gov't Ex. 7 at 12; Tr. 549–52.

The second issue also does not excuse the 45% error rate. Mr. Dutra maintained that some of the five-person mixtures in the validation study were "challenging five-person mixtures." Tr. 456. There are two problems with this explanation for the error rate.

First, for this excuse to hold water, it requires this Court to assume that Mr. Ortiz's sample was *not* a challenging mixture. But this assumption would be deeply flawed. To the contrary, there is every indication that the sample here was more complex than the norm. After all, it required three attempts before Mr. Dutra could get a usable injection to feed into STRmix. One of those attempts, of course, resulted in STRmix crashing. This pattern closely resembled the more challenging samples included in the validation study. Tr. 589.

Second, this excuse requires the Court to assume that the analysts would perform significantly better with less complex samples. But there is simply no evidence to suggest that they would—after all, analysts in the Bright paper earned failing grades with mixture samples that were not designed to be especially challenging. Given that the burden of proof is on the evidence's proponent, this Court should not carry water for the crime lab.

### C. The sample here does not resemble those included in the lab's validation materials because it likely contains related co-contributors, has irregularly skewed mixture ratios, and exhibits degradation.

The validation results should give the Court pause on their own terms. But even if they inspired confidence in the lab's ability to identify five-person mixtures, there are specific reasons for caution with Mr. Ortiz's sample. Put bluntly, the sample here does not remotely resemble those examined in the validation study.

This topic arose in testimony. Mr. Dutra testified that the known five-person mixtures did not exhibit "much, if any, degradation[.]" Tr. 166. To the contrary, they "should be close to pristine." *Id.* They did not include any "related individuals," at least not intentionally. Tr. 167. And the mixture ratios (20:20:20:20:20 and 60:10:10:10:10, Tr. 482) did not resemble the Ortiz mixture, Tr. 569, which exhibited a 44:32:17:4:3 mixture ratio according to the STRmix results. Gov't Ex. 15.

Each of these issues, standing alone, undermines the reliability of Mr. Dutra's methods. Specifically, each of these three phenomena tends to cause an *underestimate* of the true number of contributors. Degradation, according to Mr. Dutra, "would cause an underestimation of the number of contributors." Tr. 567. And extremely low-level contributors "end up having an underassessment of the number of contributors" as well. Tr. 574.

The problem of related co-contributors is the biggest of these three. As Mr. Dutra testified, related contributors to a DNA mixture will necessarily result in an underestimate of the true number of contributors due to a phenomenon known as allele sharing. He provided a stark illustration of this principle, noting that "a five-person mixture" of full-blood siblings "could appear at its face to be a two-person mixture." Tr. 162.

6

This problem is readily apparent in the Ortiz fact pattern. As established during the evidentiary hearing on the original suppression motion, police found the charged gun in a car owned and operated by a woman named Jasmin Canchola. Ms. Canchola testified at the hearing that she and Mr. Ortiz were two of four passengers in the car at the time of the arrest. Dkt. 66 (Transcript of March 24, 2022 Evidentiary Hearing) at 8. The other two passengers were Jasmin's mother and her mother's friend, whom she identified on the body-worn camera footage submitted as evidence in that proceeding.[2] *Id.* at 25.

These circumstances give rise to an obvious inference: that some of the several contributors on the gun are members of the Canchola family, most likely Jasmin and her mother, Julieta. This inference is further bolstered by the gender skew of the DNA sample in this case, which indicated that the sample was only 36 percent male. Tr. 320. The remaining 64 percent was female. Tr. 321. Given that Mr. Ortiz was the only man of the four passengers in the car, the simplest explanation for the majority-female DNA is that it belonged to these women.

Mr. Dutra explained the impact of this exact fact pattern on cross. He testified that:

> A five-person mixture with a mother and a daughter as two of the five, the two of them would have at most three alleles at any marker. And so if you take the other three contributors, they would have at most six. So the most you can have in that circumstance would be nine alleles at any marker.

---

[2] The Canchola family played a prominent role at this stage in the case. Mr. Ortiz was stopped and search on the mistaken belief that he was Marcos Canchola, and another Canchola sibling arrived at the scene of the crime within minutes of Mr. Ortiz's arrest.

7

Tr. 577. Accordingly, a mixture containing a mother-daughter pair that exhibits *more* than nine allelic peaks would necessarily contain at least six contributors.

That is exactly the case here. On redirect, Mr. Dutra agreed that "there are 12 peaks that are detected" in the data underlying the 15-second injection. Tr. 505. He claimed that, "[a]t most, 11 of them appear to be allelic" peaks rather than artifacts. *Id*. He then discounted the eleventh peak because it fell within the lab's stutter range, resulting in only "10 allelic peaks at this marker[.]" Tr. 506. Based on this ten-peak final count, Mr. Dutra identified the sample as stemming from "five contributors instead of six." *Id*.

But this reasoning falls apart when accounting for the mother-daughter pair. As Mr. Dutra testified, a five-person mixture containing a mother-daughter pair can only exhibit nine peaks. Tr. 577. Anything above nine means the mixture must contain at least six people.

In fairness, Mr. Dutra should not be faulted for failing to realize this problem. He testified that he was not told anything about the case scenario at the time of his analysis; rather, "[i]t was just a handgun and a comparison" he was ordered to perform. Tr. 153. Accordingly, he assumed the sample included Mr. Ortiz and "four unknown and unrelated co-contributors[.]" Tr. 448. He was not told that there were other occupants in the car, let alone that they were related.

The impact of this oversight is hard to overstate. As explained above, it necessarily results in an undercount of the true number of contributors. And beyond that, it has spillover effects on likelihood ratio output from STRmix. Indeed, Mr. Dutra agreed that the likelihood ratio "is not going to be right" if these assumptions were misplaced. Tr. 448.

### D. The lab has not analyzed any known six-person mixtures, leaving us in the dark on how they behave in STRmix and rendering the sample uninterpretable.

During court-initiated questioning, this Court and Mr. Dutra appeared to agree that "a 45 percent mischaracterization rate" was intuitively unacceptable. Tr. 456. The Court seemed understandably concerned with the bottom-line findings of the validation studies discussed above.

But what is perhaps more concerning is what the study did not explore: any mixtures containing *more* than five people. Real cases are not limited to five-person mixtures, and the lab needs a reliable mechanism to weed out the fours from the fives from the sixes. Since everyone agrees that the lab is not qualified to analyze six-person mixtures, reliably identifying them is necessary to ensure that STRmix is used appropriately. The 45% error rate, in some sense, undershoots the extent of the problem for the lab in real casework, because it was artificially limited to simpler mixtures than those encountered in the field.

The practical implications of this lack of data are serious. No one at the lab knows what known six-person mixtures tend to look like. No one knows how STRmix performs with six-person mixtures. No one knows whether six-person mixtures can be reliably interpreted as five-or-fewer.

This problem echoes in the issue in *Williams*, 382 F. Supp. 3d 928, 929 (N.D. Cal. 2019). There, the lab was faced with conflicting indications regarding the number of contributors: some experts thought it was a four, while others thought it was a five. *Id.* at 933–34. The lab had not validated their software on five-person mixtures, and not demonstrated any capability to reliably distinguish them from four-person samples.

The same is true here. While there is always the possibility of artifactual peaks, this sample is more than consistent with it being a six-

9

person mixture. Tr. 271. As Dr. Krane observed, "a six-person mixture would present itself very much like the test results in this case." *Id.* In some ways, in fact, the Ortiz sample demonstrates *more* peaks than a typical six-person mixture: as Dr. Krane noted, "[a] typical six-person mixture, by an allele-counting method, will give no affirmative indication that it is a six-person mixture." Tr. 276. The fact that this sample—which likely contained a mother-daughter pair—exhibited twelve peaks is unusual.

This Court should thus follow *Williams'* lead and exclude the results of Mr. Dutra's analysis. Since "the number of contributors is a foundational part of every calculation" STRmix performs, the San Diego lab must demonstrate that it can reliably divine that number. 382 F. Supp. 3d at 937. Because the lab knows nothing about six-person mixtures and demonstrably fails to reliably identify even five-person mixtures, the "entire analysis [is] outside the parameters of" STRmix at the San Diego lab. *Id.* at 938.

The government may suggest that Mr. Ortiz's complaints go to weight rather than admissibility, or that this Court would break with precedent by excluding the DNA in this case. But the opposite is true: no Court has ever admitted a five-person DNA mixture over a *Daubert* hearing, let alone a six-person mixture.

And this type of confusing, highly technical scientific evidence is the exact kind of evidence that Rule 702's drafters had in mind when they implemented the December amendments to the rule. Those amendments emphasize that "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, 2023 Amendment Note 2. The

committee added this language because too "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." 2023 Amendment Note 1. These notes have special import here because "DNA evidence can have a powerful effect on a jury's evaluation of a criminal case." *Williams*, 382 F. Supp. 3d at 938.

### III.   CONCLUSION

For these reasons, this Court should exclude the results of the DNA analysis under *Daubert*, Rule 702, and Rule 403.

Respectfully submitted,

DATED: March 20, 2024         */s/ Theo Torres*
                              Federal Defenders of San Diego, Inc.
                              Attorneys for Mr. Ortiz
                              Email: Theo_Torres@fd.org

11