TARA K. MCGRATH
United States Attorney
Brandon J. Kimura
Assistant U.S. Attorney
California State Bar No.: 241220
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9614

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO ORTIZ,<br><br>Defendant | Case No.: 21CR2503-GPC<br><br>**UNITED STATES' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE DNA EVIDENCE**<br><br>**TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES** |

Defendant moves this Court to exclude the DNA analysis in this case, alleging 5-person mixtures are inherently flawed and unreliable. Defendant's motion should fail because analysis of 5-person mixtures using STRmix probabilistic genotyping software has been found to be valid and reliable by the scientific community. This is because even if there is an error with the number of contributors, STRmix conservative analysis makes it extremely unlikely that a false inclusion will occur. This is particularly true analysis with significant contributor ratios (over 10%) and likelihood ratios of $10^4$ or greater (resulting in a verbal range of strong or very strong support for inclusion) as is the case here.

## I

## STATEMENT OF THE CASE AND FACTS

The United States incorporates by reference the Statement of Facts set forth in its Opposition to Defendant's Motion to Suppress at Dkt. 37, "Response in Opposition."

//

A.  **The San Diego Crime Lab**

The San Diego Police Department Crime Laboratory ("San Diego Crime Lab") is accredited by the ANSI National Accreditation Board ("ANAB"). Exh. 2, "ANAB Certificate of Accreditation"; Dkt. 139, "Daubert Day 1 Transcript," at pg. 10, lns. 10-25. It has retained that accreditation prior to the analysis in this case and through to the present. Dkt. 139, "Daubert Day 1 Transcript," at pg. 11, lns. 1-10. ANAB is one of the main accreditation bodies and the accreditation process requires auditing of the labs processes and standards, including its technical procedures represented by its Unit Technical Manual. *Id*. at pg. 12-15; Exh. 3. "Crime Lab Unit Technical Manual."

The San Diego Crime Lab uses the probabilistic genotyping program STRmix to help it analyze trace DNA samples. *Id*. at pg. 15-16. The STRmix program was first validated and adopted by the San Diego Crime Lab in 2015. *Id*. at pg. 19, lns. 2-19; Exh. 11, "9/30/15 - STRmix Validation Summary." STRmix is one of the most widely used probabilistic genotyping software programs and has been adopted by crime labs across the world, including many in the United States. Dkt. 139, "Daubert Day 1 Transcript," at pg. 18, lns. 17-22; Exh. 4, STRmix Webpage; Exh. 8., Tamyra R. Moretti et. al., *Internal validation of STRmix for the interpretation of single source and mixed DNA profiles*, 29 Forensic Sci. Int'l 126, 127 (2017) (the "2017 Moretti Article").

Initially, the San Diego Crime Lab only validated mixtures of up to 4-persons. Exh. 11, "9/30/15 - STRmix$^{TM}$ Validation Summary." But on March 18, 2018, the lab completed a validation study to expand its capabilities to 5-person mixtures. Exh. 14, 3/18/18 - 5-Person Validation Study (the "5-Person Validation Study"). The validation study concluded that 5-person mixtures could be reliably analyzed, resulting in its adoption for casework on that date. *Id*.

When the San Diego Crime Lab first began using STRmix, there was initially no regulatory body or guidelines for the validation of probabilistic genotyping tools. Dkt.141, "Daubert Day 3 Transcript," at pg. 468, lns. 5-25. That changed when the FBI set up a regulatory body called the Scientific Working Group on DNA Analysis Methods or

"SWGDAM." *Id*. "SWGDAM provides guidelines and the Quality Assurance Standards for Forensic DNA Testing Laboratories provide quality assurance requirements for validation." Exh. 8., "2017 Moretti Article." These guidelines have become generally, if not universally, accepted by the forensic science community. *Id*. at pg. 469, lns. 9-13; Exh. 13, "2017 SWGDAM Guidelines." The San Diego Crime Lab has closely modeled their own technical interpretation guidelines to be in compliance with SWGDAM's guidance. Dkt.141, "Daubert Day 3 Transcript," at pg. 472, lns. 3-12.

SWGDAM's guidance includes "[t]he use of safeguards (such as a stochastic threshold) …to mitigate the uncertainty inherent to binary interpretation of single source, mixed-source and low-level typing results." Exh. 8., "2017 Moretti Article" at 127. But while the SWGDAM guidelines recommend the use of safeguards, it also recognizes that the interpretation and reporting of DNA typing results for human identification purposes requires "professional judgment and expertise." Exh. 13, "2017 SWGDAM Guidelines" at pg. 3.

A. **Arrest and DNA Analysis**

Defendant Francisco Ortiz ("Defendant") was arrested and charged for possession with intent to distribute methamphetamine and illegal possession of a firearm by a felon on January 26, 2020. As part of that investigation, the firearm was sent to the San Diego Crime Lab for analysis, including DNA analysis. On April 29, 2020. San Diego Crime Lab Criminalist Adam Dutra completed a DNA analysis report. Exh. 10, "DNA Report." The report stated that a swab of the firearm and magazine recovered on January 26, 2020, contained DNA. *Id*. That DNA sample was found to contain a 5-person mixture. *Id*. That mixture included a 44% contributor, a 32% contributor, a 17 percent contributor, a 4% contributor, and a 3% contributor. *Id*. Defendant was determined to be the 32% contributor and the report found "*Very strong support for*" his inclusion, the very highest level of support the San Diego Crime Lab uses. *Id*. at 1, 4. Specifically, the report expressed that it "is $5.42 \times 10^8$ times more likely to obtain the DNA results if Francisco Ortiz is a contributor than if this person is not a contributor." *Id*. at 1.

B.  **Defendant's Motion & Evidentiary Hearing**

On December 8, 2023, Defendant filed a motion to exclude the San Diego Crime Lab report. Dkt. 120, Def's. Mot. To Exclude DNA. The basis of his motion was that the 5-person mixture was too complex, and that the San Diego Crime Labs analysis of the mixture was flawed. *Id*. Specifically, Defendant argued that it is difficult for analyst reviewing complex samples—those containing 4 or more apparent contributors[1]—to accurately determine the actual number of contributors ("NOC"). He argues that this variability impacts the ability of the probabilistic genotyping software, STRmix, from reliably and accurately assigning a likelihood ratio ("LR").

This difficulty is due to the stochastic effects attendant to complex mixtures including allele sharing. He also argues that the human judgment necessary to determine the NOC in complex mixtures renders this analysis unreliable. Finally, he argues that analysis of 5-person mixtures generally, and San Diego Crime Labs process specifically, are inherently flawed.

This Court conducted a 3-day evidentiary hearing on this matter. The United States presented testimony from its expert Mr. Dutra. Defendant presented testimony by Dr. Dan Krane. At the close of the hearing, the Court instructed the parties to focus their briefing on the validity and reliability of 5-person mixture analysis, and the San Diego Crime Lab's validation of the same.

## II
## ARGUMENT

Defendant seeks to exclude DNA evidence arguing that the methodology used was inherently unreliable. Defendant's motion fails because peer reviewed studies and the San Diego Crime Lab's own validation have shown that 5-person mixtures, but particularly those identifying significant contributor (ratios over 10%) and likelihood ratios of $10^4$ or greater, are reliable, even assuming errors in accurately assigning the NOC.

---

[1] Apparent contributors refer to the determination of the number of contributors based on analysis of the sample as opposed to the actual NOC (when it is known, usually is controlled experiments).

Next, issues with accurately assigning the NOC have been reviewed by courts over the past decade, with the overwhelming majority determining that the issue is weight, not admissibility.

Finally, the likelihood ratio used to represent the findings in this case is not unduly prejudicial because it is the most accurate representation of the results.

## A.     <u>Relevant Law</u>

To admit expert testimony, the burden is on the proponent of the testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Cttee. Notes.

Federal Rule of Evidence 702 states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2000); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *accord Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 148–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1023 (9th Cir. 2022)(citing *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786).

The test for relevancy is a simple and expansive one, an expert's "opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "[I]t is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Elosu*, 26 F.4th at 1024. To evaluate reliability, the court "must assess the expert's reasoning or methodology, using as appropriate criteria such as testability,

publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona*, 750 F.3d at 1044. These factors, however, are non-exclusive and the court has "discretion to decide how to test an expert's reliability based on the particular circumstances of the particular case. *Elosu*, 26 F.4th at 1024.

The court, "[i]n evaluating proffered expert testimony… is a gatekeeper, not a fact finder." *City of Pomona* 750 F.3d at 1044. Ultimately, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology" and,

> Accordingly the district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility, rather than the judge. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Elosu*, 26 F.4th at 1024 (internal quotations and citations omitted). This is consistent with the "liberal thrust of Rule 702" which should be applied in a manner "favoring admission." *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014)(quoting *Daubert*, 509 U.S. at 588, 113 S.Ct. 2786).

## B. **STRmix's Five Contributor Analysis is Reliable.**

The United States presented evidence of two peer reviewed studies that included 5-person mixtures during the *Daubert* hearing. The first was the 2017 study of the FBI's own validation of STRmix. Exh. 8., "2017 Moretti Article." The second was the 2018 publication of the validation studies of 31 labs, including the FBI and the San Diego Crime Lab. Exh. 7., Jo-Anne Bright et. al., *Internal validation of STRmix™ – A multi laboratory response to PCAST*, 34 Forensic Sci. Int'l Genetics 11 (2018) (the "2018 Bright Article.").

Finally, the United States presented the San Diego Crime Lab's own internal validation study of 5-person mixtures. Exh. 14, ("5-Person Validation Study"). Each of these studies rigorously tested STRmix's ability to analyze 5-person mixtures in simulated real world scenarios and found its results to be reliable. This was despite the issues related

to accurately assigning NOC, because even in these situations, the programs conservative analysis skewed towards exclusion rather than inclusion. And, in particular, these studies confirmed the high accuracy of STRmix in analyzing and identifying true contributors in 5-person mixtures with significant contributor ratios (over 10%) and likelihood ratios of $10^4$ or greater.

For this reason, Defendant's motion should be denied.

### 1. <u>2017 Moretti Article – FBI Finds STRmix 5 Contributor Analysis Reliable.</u>

The first study presented was the 2017 article "Internal validation of STRmix for the interpretation of single source and mixed DNA profiles." Exh. 8., "2017 Moretti Article." The article reported the results of the FBI laboratory's internal validation study of STRmix for casework usage "using 300 single-source and mixed contributor profiles." *Id*. The study is particularly relevant to the facts of this case because it included simulated specimens "that included DNA from *two to five donors* across a broad range of template amounts and contributor proportions." *Id*. (emphasis added). The study concluded that "STRmix is sufficiently robust for implementation in forensic laboratories." *Id*.

The study included variables to make it relevant to real world samples including "degraded DNA and/or multiple contributors of similar low-level template quantities." *Id*. at 130. "The resulting profiles variously exhibited inter- and intra-locus peak height variation, complete profile recovery, allele and locus dropout, DNA degradation, additive effects of allele or stutter peak sharing and peak saturation (off-scale peaks)," many of the same issues raised by Defendant, his expert, and Mr. Dutra in the analysis in this case and complex mixtures generally. *Id*. at 128. *See* Dkts. 139-141, *Daubert* Transcripts. The study also analyzed, "277 two, three, four and five-person mixtures," with 24 specifically 5-person samples. *Id*. at 129-30, tbl. 1.

The article defined "sensitivity" as the "ability of the software to reliably support the presence of a contributor's DNA within the DNA typing results." *Id*. at 130. Notably, for this Court's analysis, "failure to detect alleles and/or return support for the presence of a

low-level known contributor do not necessarily constitute an error in the analytical process or probabilistic genotyping system." *Id*. "In general, the LR for a true contributor should be high but trend to 1 [uninformative] as less typing information to aid interpretation is available and as the number of contributors increases." *Id*.

"As expected, where contributor template amount decreased and/or contributor number increased, LRs trended to 1," meaning they trended towards inconclusive. *See id*. at 131. For 5-person mixtures, the study looked at STRmix's performance when conditioned on one known contributor versus an unconditioned analysis. *Id*. at 131, fig. 2. Admittedly and unsurprisingly, these complex samples were more difficult for the program to analyze. *See id*. at 134. But significantly, the results "indicated that specificity is still high with five-person mixtures: 97% of HPD LRs were <1 (N = 5256 total tests)." *Id*. at 132, 134, fig. 2-3. "Specificity was further improved when the STRmix interpretations were conditioned on one known contributor. For these analyses, >99% of H1-true propositions resulted in HPD

LRs < 1 (N = 3200), and only four resulted in incorrect H1 support," all no greater than 10-99 ("limited support"). *Id*.





Fig. 2. (Continued)

*Id*. at 132, fig. 2-3. Notably, these results show that non-contributors were generally excluded, and where they crept in to inclusionary LRs, they did so at amounts less than 10% and at LRs less than 100. *See id*.

The study also specifically tested instances where the program was given the incorrect overestimation of the number of contributors noting,

> Given a contributor number of N and the assumption of an additional contributor (N + 1), STRmix adds the additional (unseen) contributor at trace levels which, when considered with the true trace contributor,

> diffuses the genotype weights and can either return *a false exclusion or lower the LR of a true contributor* [27,35]. The LR of the major contributor is not appreciably different when N + 1 contributors are assigned.

*Id*. at 14 (emphasis added). Thus, even when an error was included, the program did not falsely include non-contributors or incorrectly inflate true contributors. *See id*. The study also specifically looked at underestimates in 5-person mixtures presenting as 4-person mixtures, which matched the trends of the smaller mixtures with underestimated NOCs:

> By way of explanation we present an example of a true five contributor mixture interpreted assuming four contributors. Fig. 3 is a stylised electropherogram for one locus (SE33) with peaks and their corresponding height. STRmix™ has modelled the minor peaks as stutters of the eight alleles all above 800 rfu. Assuming four contributors and eight alleles, each contributor must be heterozygous at this locus. One known contributor who is homozygous at this locus (genotype 18,18) is therefore excluded ($LR_{SE33}=0$) as a contributor under the assumption of four contributors. A second individual (genotype 12,23.2) is a poor fit to the profile assuming four contributors given the large peak imbalance for these alleles resulting in a low weight and subsequent LR at this locus ($LR_{SE33}=0.01$).

*Id*. at 16.

The study did not analyze overestimated 5-person mixtures (5-person mixtures presenting as 6-person mixtures). But the study noted overestimates of NOC in smaller mixtures did lead to some false inclusions, but these were at relatively low contributor amounts and LRs well short of 5, or barely in inclusionary territory. *See id*. pg. 19, figs. 7-8, pg. 20.

Overall, the study showed that overestimates and underestimates most significant effects were some exclusions of true contributors or lowered the LR of true contributors, making the analysis in both situations' conservative in nature. *See id*.

Based in part on these finding, the study concluded that "the software proved to be appropriately sensitive and specific." *Id*. at 143.

> Across more than 60,000 tests, 93.4% of true contributors produced HPD LRs supporting inclusion, and greater than 99.9% of non-contributors

resulted in HPD LRs supporting exclusion. Specificity with five-person mixtures was further increased by conditioning the interpretation on a known contributor. In all cases where non-contributor comparisons generated HPD LRs > 1, the results were consistent with scientific expectations given the mixture quality and complexity (e.g., degradation, allelic dropout) and the number of contributors.

*Id.*[2]

### 2. 2018 Bright Article – Multiple Labs Find STRmix 5 Contributor Analysis Reliable.

The next study presented was the 2018 article "Internal validation of STRmix™ – A multi laboratory response to PCAST." Exh. 7., "2018 Bright Article." The article compiled and reported the internal validations of 31 labs "resulting in 2825 mixtures comprising three to six donors and a wide range of multiplex, equipment, mixture proportions and templates." *Id*. at 12. The article was a direct answer to the 2016 President's Council of Advisors on Science and Technology (PCAST) Report on issues related to the interpretation of complex DNA mixtures (defined as mixtures containing 3 or more contributors) which is cited by Defendant in his motion. *Id*.; *See* Dkt. 120, Def's Mot. to Exclude.

"Mixtures of three, four, five, and six contributors were specifically targeted in order to address the criticisms of PCAST." Exh. 7., "2018 Bright Article" at 12. Among other issues, the study specifically looked at how well STRmix performed when the number of contributors to the mixture is unknown, including using apparent rather than known contributors through blind submissions from the labs. *Id*. This included actual 5 person samples, with an additional contributor (as alleged in this case). The programs settings were determined by the participating lab, which included the San Diego Crime Lab, using their own validated methods. *Id*. at 11-12, 20.

Much like the 2017 Moretti Article, the study observed false *exclusions* (negative LRs) of true donors when the NOC were underestimated (NOC -1). *Id*. at 15-16, 22. Also

---

[2] Recent court opinions have cited to this study in finding STRmix generally reliable. *See United States v. Lewis*, 442 F. Supp. 3d 1122, 1148 (D. Minn. 2020)( Finding that the study "provides a reasonable level of assurance of its reliability."); *United States v. Washington*, No. 8:19CR299, 2020 WL 3265142, at *3 (D. Neb. June 16, 2020); *Hudson v. State*, No. 303, 2022, 2024 WL 91187, at *7 (Del. Jan. 9, 2024);

like the prior 2017 Moretti Article, the study found that overestimated samples (NOC+1) resulted in a "decrease in the LR for true contributors," but that LRs were "relatively unaffected" when the person is a larger proportion of the mixed profile. *See id*. at 18.

The study found that in overestimation was less common than underestimation. *Id*. at 22. And, in overestimation scenarios with minor contributors, the change in LR was "not extreme" and in no instance did "an increase in the number of contributors" shift an LR that "strongly favours inclusion…to one that favours exclusion." *Id*.

> Put another way, inflating the number of contributors leads to an increase in non-zero LRs. In fact, the most common occurrence from inflating the number of contributors is that during deconvolution the additional proposed contributor is assigned a very low template (near 0) and can possess any genotype (including complete dropout) with relatively even weight.

*Id*. at 19. The study admittedly found a "small increase in the number of *very low grade* false inclusions" in overestimation scenarios. *Id*. at 22. But with regards to true contributors, the analysis is either "correct or conservative," which, the study noted, could be argued as presenting *"less risk of misleading a court."* *Id*. (emphasis added).

Overall, the study found, consistent with the 2017 Moretti Article, "*less discriminatory LRs* for true and noncontributors when the number of assigned contributors increases." *Id*. at 20 (emphasis added). But, the study noted, this "does not mean that mixed DNA profiles containing more contributors are less reliable, just that they are less informative with respect to potential contributors." *Id*. Ultimately, the study found that STRmix demonstrated "foundational validity" for the complex, mixed DNA profiles (3 to 6 person mixtures) which it tested.[3] *Id*. at 23.

//

//

---

[3] Like the Morretti Study, recent court opinions have also cited to this study in finding STRmix generally reliable. *See Lewis*, 442 F. Supp. 3d at 1148; *United States v. Tucker*, No. 18 CR 0119 (SJ), 2020 WL 93951, at *4 (E.D.N.Y. Jan. 8, 2020); *Washington*, No. 8:19CR299, 2020 WL 3265142, at *3; *People v. Davis*, 75 Cal. App. 5th 694, 717, 290 Cal. Rptr. 3d 661, 680 (2022).

### 3. San Diego Crime Lab Internal Validation Found STRmix 5 Contributor Analysis Reliable.

Finally, in addition to peer reviewed articles, the analysis in this case was also backed by San Diego Crime Lab's own internal validation of 5-person mixtures, which it completed on March 18, 2018. Exh. 14, ("5-Person Validation Study").[4]

In its internal validation, the San Diego Crime Lab acknowledged that 5-person mixtures "are generally very complex and require much consideration before interpreting." *Id*. at 1. This complexity included the difficulty in determining the correct NOC, which is often underestimated. *Id*. It also acknowledged that the results of these issues could affect LRs. *Id*. Despite these known issues, the lab set about to determine whether they could reliably validate STRmix for these mixtures.

The study examined twelve 5-person mixtures. *Id*. at 1. The samples included variable and balanced mixture amounts. *Id*. at 1-3. The samples were first run against a database of 76 individuals. *Id*. at 6. The results showed that "strong support for inclusion" of all known contributors for most of the mixtures. *Id*. at 6. Stochastic effects introduced some uncertainty, but those issues resulted in conservative negative or inconclusive LRs for low level contributors. *See id.* The study also showed a false inclusion, but with a low positive LR of 363, or currently verbally described as moderate support for inclusion. *Id*. at 7. All other non-contributors had inconclusive or negative LRs. *Id*. This was also graphically represented at Figure 5. *Id*. at 8.

Ultimately, the study concluded that 5-person mixtures could be reliably interpreted. *See id*. at 9.

Next, the lab separately studied mixtures, including 5-person mixtures, using apparent NOCs. *Id*. at 10. As Defendant pointed out, these apparent NOCs underestimated the actual NOCs. These mixtures were then run against a database of 10,000 profiles. *Id*. at 11. As expected, using the larger comparison base increased the potential for error. *Id*. This

---

[4] The lab later upgraded a new version of STRmix in 2017, that included improvements to the program's memory usage. Exh. 15, ("2017 Performance Check").

included the potential for false inclusions, but again, these were at lower LRs, the highest being 539, which, would be described as moderate support for inclusion. *Id*. at 13-14, tbl. 7 (mixture 5_4). The false inclusion did not reach the stronger $10^4$ or $10^6$ LR needed for strong or very strong support for inclusion. *See id*. The LRs of known contributors also decreased with the increased complexity and the apparent NOC assumption, resulting in more conservative results. *See id*.

### 4. Validity and Reliability of 5-Person Mixtures

Admittedly, there is negative persuasive caselaw regarding 5-person mixtures. *United States v. Williams*, 382 F. Supp. 3d 928 (N.D. Cal. 2019). In *Williams*, the court excluded a 5-person mixture that returned "very strong support" for the proposition that the defendant contributed to the DNA sample. *Id*.

*Williams* is distinguishable. First, the analysis in *Williams* used a different software program, Bullet, and the lab validated this program for mixtures of up to 4 contributors. *Id*. at 931. In excluding the analysis, the court also noted the lab tested the same items twice. *Id*. at 932. This was significant because of the amount of time between the first and second test—six years—which resulted in signs of degradation that may have caused additional dropout, and thus impaired the number of contributor analysis. *Id*. The first analysis found that the sample was a 5-person mixture, a number that lab was not validated to analyze. *Id*. at 932. The second test, consistent with a 6-year delay, showed dropout, which may have resulted in the analyst determining the number of contributors to be at least four. *Id*. at 933.

These concerns are not present in this case. First, the sample was tested just months after it was collected. Next, the San Diego Crime Lab *is* validated to analyze 5-person contributors. And studies have found STRmix to be reliable, even when 5-person mixtures are incorrectly determined to be 4 person mixtures. Finally, the Bullet software program used in *Williams* also did not appear to have the scientific backing present in this case. The studies presented by the United States prove the validity of 5-person mixtures. While each admit that these mixtures are complex and difficult to analyze, and that the NOC determination is often inaccurate, all of the studies found that STRmix remained reliable

and valid. This was not because the analysis was perfect, or error free. But the *Daubert* analysis does not require perfection. *Kane v. PaCap Aviation Fin.*, LLC, 652 B.R. 184, 208 (D. Haw. 2023). Instead, these studies found that even when an error occurred, the error did not have a significant affect on accuracy and thus, reliability. And, as it relates to this case, an error did not affect identification of true contributors in 5-person mixtures with significant contributor ratios (over 10%) and likelihood ratios of $10^4$ or greater. When combined with the "liberal thrust of Rule 702" that favors, admission, this evidence in this case is admissible. *See Messick*, 747 F.3d at 1197.

For all of these reasons, Defendant's motion should be denied.

## C. The Number of Contributor Analysis is an Issue of Fact for the Jury.

Defendant argues that the discretionary NOC determination, made within the policies and practices of the San Diego Crime Lab and SWGDAM guidelines, are unreliable because they could be erroneous. Much of Defendant's *Daubert* presentation was devoted to this issue.

Such a result, however, would be contrary to the overwhelming majority of courts that have reviewed this issue and found that these arguments go to the weight of this type of conflicting testimony, not its admissibility. *See United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020)(Contentions that DNA analysis was unreliable because of predetermined drop out rates, estimates on allelic frequencies and the number of contributors go to the weight, not the admissibility, of the testimony); *United States v. Cortorreal*, 668 F. Supp. 3d 309, 323 (S.D.N.Y. 2023) (Noting that it "joins the chorus of the overwhelming majority of courts that have considered this issue — concerns over the reliability of opinions based on LCN testing" including number of contributor analysis, stochastic effects "go to weight, not admissibility."); *See United States v. Barton*, No. 8:14-CR-496-T-17AEP, 2016 WL 11469438, at *7 (M.D. Fla. Sept. 10, 2016) (Issues related to stochastic effects in complex mixtures go to the weight to be accorded to the evidence, not to its admissibility); *see also People v. Burrus*, 81 Misc. 3d 550, 658, 200 N.Y.S.3d 655, 730 (N.Y. Sup. Ct. 2023)(Arguments including dropout and mischaracterization of number of contributors,

made by defense experts (including Dr. Krane) have to do with the weight of the evidence, not the admissibility, despite the more rigorous *Frye* standard); *Russell v. Covello*, No. 2:19-01838 DSF (ADS), 2021 WL 3744388, at *11 (C.D. Cal. Apr. 29, 2021) (Drop out and other stochastic effect in DNA analysis went to weight rather than admissibility)l; *State v. Warner*, No. A-15-858, 2016 WL 4443559, at *5 (Neb. Ct. App. Aug. 23, 2016)(Issues related to number of contributor methodology and analysis goes to weight not admissibility); *People v. Debraux*, 50 Misc. 3d 247, 256, 21 N.Y.S.3d 535, 542 (N.Y. Sup. Ct. 2015) (Manner of accounting for stochastic effects, such as allelic drop-in and drop-out rates, properly a matter for consideration by the jury).

Exclusion of this evidence also runs counter to the generally accepted process for this determination. Defendant's expert, Dr. Krane, confirmed that judgment and experience play a "significant role" in some aspects of this process. Dkt. 140, "Daubert Hearing – Day 2" at pg. 371, lns. 8-11, pg. 372 lns. 1-3. This consistent with the highly regarded SWGDAM guidelines which "recognizes that the interpretation and reporting of DNA typing results for human identification purposes requires professional judgment and expertise." Exh. 13, "2017 SWGDAM Guidelines" at pg. 3. Admission is also in keeping with this Court's role as a gatekeeper, not a fact finder. *City of Pomona* 750 F.3d at 1044; *see also United States v. Morgan*, 53 F. Supp. 3d 732, 746 (S.D.N.Y. 2014), aff'd, 675 F. App'x 53 (2d Cir. 2017) (Competing opinions on the number of contributors in a DNA analysis is an issue of credibility and is "is precisely the type of disagreement that the flexible thrust of *Daubert* entrusts the jury to decide."); *People v. Davis*, 75 Cal. App. 5th 694, 722, 290 Cal. Rptr. 3d 661, 684 (2022)(Fact STRmix involves human judgment (e.g., the determination of the number of contributors to a mixed-source DNA sample based on an interpretation of the STR DNA-typing results) provides grist for adversarial examination, not grounds for exclusion.).

//

//

## C. The Expert's Likelihood Determination is Not Unduly Prejudicial

Finally, Defendant argues that the presentation of the DNA results as a likelihood ratio is unduly prejudicial. It is the United States' burden under Federal Rule of Evidence 403 to show the probative value of any evidence is not outweighed by its prejudicial effect.

In this case, the DNA evidence is extremely probative, it goes to the crux of a significant issue in the case, whether Defendant possessed the firearm. The presentation of this evidence is not unduly prejudicial. Notably, the likelihood ratio cannot explicitly say that Defendant possessed the firearm because, as Defendant's expert pointed out, it cannot say how the material containing the DNA was transferred onto the firearm. *See* Dkt. 120, Def. Mot. to Exclude, Exh. C at 7. Also, the likelihood ratio is an expression of probabilities, not certainty, and is considered best practices throughout the scientific community. Dkt. 139, "Daubert Day 1 Transcript," at pg. 79, ln. 11 – pg. 80, ln. 10.

Courts have also agreed that likelihood ratios are not unduly prejudicial. *See United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993). In *Bond*, the court considered an identical claim. *Id*. In finding the likelihood ratio was not unduly prejudicial, the court explained "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *Bonds*, 12 F.3d at 567(internal quotation and citations omitted). For the reasons argued above, the likelihood ratio is not founded on an improper basis.

For these reason Defendant's motion should be denied.

//

//

//

//

//

# V
# CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendant's Motion to Exclude DNA Evidence be denied.

DATED:                                      Respectfully submitted,

TARA K. MCGRATH
                                            United States Attorney

                                            /s/Brandon J. Kimura
                                            BRANDON J. KIMURA
                                            Assistant United States Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. Case No. 21CR2503-GPC |
|---|---|---|
| Plaintiff, | ) | |
| | ) | CERTIFICATE OF SERVICE |
| v. | ) | |
| | ) | |
| FRANCISCO ORTIZ, | ) | |
| Defendant | ) | |

IT IS HEREBY CERTIFIED THAT:

I, Brandon J. Kimura, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of United States' Response in Supplemental Opposition to Defendant's Motion Exclude DNA on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Theo Torres, Esq.

Attny for Defendant FRANCISCO ORTIZ

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 21, 2024.

s/<i>Brandon J. Kimura</i><br>BRANDON J. KIMURA