**THEO TORRES**
California State Bar No. 324059
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Email: Theo_Torres@fd.org

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cr-02503-GPC |
| Plaintiff | Hon. Gonzalo P. Curiel |
| v. | April 19, 2024 10:00am |
| FRANCISCO ORTIZ, | **Mr. Ortiz's Response to the Government's Post-Hearing Briefing in Opposition to His Motion to Exclude DNA Evidence** |
| Defendant | |

## I.    INTRODUCTION

There are three key issues with the government's post-hearing briefing. Dkt. 160. First and foremost, the government misunderstands both *Daubert* and the science itself when it claims that Mr. Ortiz's motion fails because it is "extremely unlikely that a false inclusion will occur" from a number-of-contributors underestimate. Dkt. 160 at 1. Second, the government fails to meaningfully distinguish *Williams* from Mr. Ortiz's case—especially given the December amendments to Rule 702, which expressly encourage courts to exercise their essential gatekeeping function. And third, the government appeals to the supposed general acceptance of likelihood ratios rather than

explaining how the deeply flawed likelihood ratio *in this case* risks confusing the jury.

## II.   ARGUMENT

### A. The government has not offered any sound reason to believe that number-of-contributors underestimates for six-plus-person mixtures result in false exclusions rather than false inclusions.

In its briefing, the government does not devote much space to defending Mr. Dutra's number-of-contributors determination. To the contrary, at no point does the government attempt to justify Mr. Dutra's key, disputed conclusion: that this sample represented a mixture of only five people. In contrast to Mr. Dutra's testimony, the government's brief contains no discussion of stochastic effects, allele sharing, or the three injections generated during this case.

Instead, the government essentially argues that Mr. Dutra's number-of-contributors conclusion doesn't really matter. According to the government, underestimates on this front tend to benefit the guilty because "the program's conservative analysis skewed towards exclusion rather than inclusion." Dkt. 160 at 7. From this premise, the government argues, we can assume that the likelihood ratio accurately incriminated Mr. Ortiz.

But this premise is flawed. As Dr. Krane testified, Mr. Dutra's claims in this vein are based on "extrapolation" rather than "interpolation." Tr. 410. This error holds true in the briefing: the government asks the Court to assume that general trends present in the FBI's internal validation study—which only analyzed two-to-five-person mixtures—will hold true for six-plus-person mixtures mischaracterized by the San Diego Police Department. Dkt. 160 at 10.

2

To be sure, it may well be the case that number-of-contributors errors beget false exclusions more often than false inclusions for low-complexity samples. But that trend should not be imputed to high-complexity samples like the one in Mr. Ortiz's case without empirical evidence on how six-plus-person mixtures behave under these conditions.

And there are good reasons to believe these six-plus-person mixtures would not mirror the behavior of their low-complexity counterparts. After all, Dr. Krane observed that simple mixtures "behave differently" than complex mixtures "[a]cross a variety of aspects of the analysis." Tr. 308.

This phenomenon bleeds over to the likelihood ratios. Dr. Krane testified that "a false inclusion will occur as a direct result of underestimating the number of contributors" to a high-complexity sample. Tr. 309. As an illustration of this problem, Mr. Dutra agreed that his lab's own validation study contained four false inclusions for the handful of known five-person mixtures they underestimated. Tr. 597.

These false inclusions persisted even though the samples were "close to pristine" and included no related co-contributors. Tr. 166-67. And this is to say nothing of the impact an underestimation might have on the *degree* of the likelihood ratio or the share of the DNA sample attributed to any given suspect.[1]

Critically, the frequency of false inclusions for mixtures of more than five people remains unknown. Neither the San Diego Crime Lab nor any of the researchers cited in the parties' papers have explored this issue. At bottom, "it would not be fair to say we know that the implications are for underestimating the number of contributors to a six-person mixtures . . .

---

[1] For instance, Mr. Dutra concluded that Mr. Ortiz contributed 32% of the sample in this case, but that 32% figure could only shrink with a greater number of contributors.

3

1   when fed to STRmix, for instance, as a four- or a five-person mixture
2   incorrectly." Tr. 308. As Mr. Dutra conceded, "such a study could devised[,]"
3   but "[w]e haven't had such a study up to this point." Tr. 457.

4       The government's reliance on extrapolation rather than interpolation
5   should be rejected. As the NIST Report cautioned, "[i]f validation studies are
6   conducted using mixtures that do not explore the complexity induced by
7   allele sharing, the user may inadvertently extrapolate validation results and
8   apply methods beyond the limits of the validation studies conducted." Ex. O
9   at 234. Without any validation of six-person mixtures, the government
10  cannot carry its burden to prove such an analysis is reliable under *Daubert*.

11  **B. None of the government's legal authority concerns a case**
12     **quite like this and the government fails to meaningfully**
13     **distinguish Mr. Ortiz's sample from the one excluded in**
       ***Williams.***

14      The government's legal claims likewise miss the mark. It cites a string
15  of cases concerning probabilistic genotyping issues of varying stripes. Dkt.
16  160 at 15-16.

17      These cases, however, do not have much to say about the specific claims
18  in this case. For instance, *United States v. Jones* did not address number-of-
19  contributors errors whatsoever. 965 F.3d 149 (2d Cir. 2020). *United States v.*
20  *Barton* and *United States v. Morgan*, to be fair, did raise number-of-
21  contributors claims, but for three-person mixtures—the kind that both Mr.
22  Dutra and Dr. Krane would agree can be reliably analyzed. No. 8:14-CR-496-
23  T-17AEP, 2016 WL 11469438 (M.D. Fla. 2016) and 53 F. Supp. 3d 732, 745
24  (S.D.N.Y. 2014).

25      Other cases originate from state courts applying their own standards
26  rather than *Daubert*. *See, e.g.*, *People v. Burrus*, 81 Misc. 3d 550, 637 (N.Y.
27  Sup. Ct. 2023) (analyzing a different probabilistic genotyping program under
28

4

New York state law's *Frye* standard); *People v. Debraux*, 50 Misc. 3d 247 (N.Y. Sup. Ct. 2015) (same); and *State v. Warner*, No. A-15-858, 2016 WL 4443559, at *5 (Neb. Ct. App. Aug. 23, 2016) (admitting a three-person mixture under Nebraska state law). Still others involve low-complexity mixtures subjected to the unforgiving AEDPA standard rather than *Daubert*. *Russell v. Covello*, No. 2:19-01838 DSF (ADS), 2021 WL 3744388, at *11 (C.D. Cal. Apr. 29, 2021).

Most revealing is the government's citation to *United States v. Cortorreal*, 668 F. Supp. 3d 309, 323 (S.D.N.Y. 2023). The government's parenthetical suggests that the *Cortorreal* court sided with the prosecution on a *Daubert* issue involving "number of contributor analysis." Dkt. 160 at 15.

This suggestion is misleading. Rather than approve the number-of-contributors determination in *Cortorreal*, the district court sharply disapproved of the government's efforts to admit a three-person analysis in which the allele count was consistent with the sample being a four-person mixture. The court observed that the government's theory required it to "discount[] some of the alleles as probably not real alleles" to consider the sample a three-person mixture. Ex. R (Transcript from *United States v. Cortorreal*, 17cr438, S.D.N.Y. 2023) at 1230. Noting that "there's no way a jury is going to understanding this[,]" the court remarked that "it's a problem for the government" to get past *Daubert*. *Id.* at 1230-31. It concluded by posing a blunt question to the government: "Are you sure you want to use this evidence?"

The government heeded the court's warning. In a post-hearing submission, the government conceded "that it w[ould] not seek to introduce at trial DNA evidence" regarding the item at the heart of the court's question.

*United States v. Cortorreal*, 17cr438 (S.D.N.Y.) at Dkt. 773. *Cortorreal*, then, supports Mr. Ortiz's *Daubert* claims.

As a result, none of the government's cases bear much weight here. As the government admits, "there is negative persuasive caselaw regarding 5-person mixtures." Dkt. 160 at 14. The only case to consider such a question is Judge Orrick's order in *United States v. Williams*, 382 F. Supp. 3d 928 (N.D. Cal. 2019).

The government fails to distinguish *Williams* from this case. It first claims that *Williams* holds little weight because it involved a non-STRmix software called Bullet. Dkt. 160 at 14. But the testimony regarding that software mirrored the testimony offered about STRmix in Mr. Ortiz's case: specifically, that "the number of contributors is a foundational part of every calculation Bullet performs." 382 F. Supp. 3d at 937.

Second, the government claims that the *Williams* sample exhibited degradation because it was tested twice over the course of years. Dkt. 160 at 14. This sequence of tests reduced the amount of genetic information in the sample, resulting in a potential underestimate of the number of contributors from five to four.

But a similar issue came up in Mr. Ortiz's case in the form of the three successive injections. Both experts agreed that each of these injections reduced the strength of the allelic peaks. Mr. Dutra was clear: "each time you do inject, there is less – there is a reduction." Tr. 587. This reduction resulted in a smaller number of peaks detected in the second 24-second injection than in the initial one. *See* Ex. D (Summary Table of Alleles for All Three Injections). This same phenomenon was observed in *Williams*: "a side-by-side comparison of the fifteen loci amplified in 2012 and the same ones amplified in 2018 shows more alleles in the prior testing." 382 F. Supp. 3d at 937.

And three injections aside, there is no evidence that the Ortiz sample did not exhibit degradation. To the contrary, the STRmix Interpretation Report assigned degradation curves to each of the five assumed contributors to the sample. Ex. O. At no point did Mr. Dutra opine that the Ortiz sample remotely resembled the "pristine" samples included in the lab's previous testing.

Finally, the government claims that the *Williams* lab had not validated Bullet for five-person mixtures, while the San Diego lab has. Dkt. 160 at 14. But this claim fundamentally misunderstands the issues in both *Williams* and Mr. Ortiz's case. Put simply, five-person mixtures in *Williams* played the same role that six-person mixtures do in Mr. Ortiz's case. Each of these categories reflects a complexity that the respective labs simply did not validate. 382 F. Supp. 3d at 938. And the number of allelic peaks in both *Williams* and Mr. Ortiz's case both suggest that the true of contributors exceeds the respective labs' validated thresholds. *Id.* at 937.

These problems are all the more salient in light of the recent amendments to Rule 702, which the government does not acknowledge. *See* Dkt. 159 at 10-11. Given that the *Williams* court excluded the DNA evidence even before these amendments, the same remedy is warranted here.

### C. The likelihood ratio in this particular case risks unduly confusing the jury and unfairly prejudicing them against Mr. Ortiz.

Lastly, the government maintains that the likelihood ratio statistic is "not unduly prejudicial" under Rule 403. Dkt. 160 at 17. As support, it claims that a Sixth Circuit case from the early 90s "considered an identical claim" and held "that likelihood ratios are not unduly prejudicial." *Id.* (citing *See United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).

The problem here is glaring: *Bonds* simply did not involve likelihood ratios. At no point in the court's opinion was the word "ratio" even used. Instead at issue was an entirely different statistic, referred to by the panel as a "multiplication rule." *Id.* at 552. That statistic generated a straightforward, intuitive result: that only 1 in 35,000 randomly selected white men would share the defendant's DNA profile. *Id.* The defendant challenged this statistic substantively, not because it was confusing or counterintuitive.

The same can't be said of the likelihood ratio in Mr. Ortiz's case. Rather than a simple one-in-a-million type of "match" result, the Bayesian likelihood ratio requires the factfinder to compare two competing hypotheses posited by the DNA analyst. The output takes a clunky form: that the results are some order of magnitude more likely to be obtained if the sample was composed of four unrelated, unknown co-contributors and Mr. Ortiz than if the sample was composed of five unrelated, unknown co-contributors. *See* Tr. 442-43 (Dutra describing the output). The underlying probability affected by the likelihood ratio is itself fundamentally unknown.

This formulation, unsurprisingly, can be hard to understand. Mr. Dutra agreed, lamenting that "[t]he statistics that we have presented have regularly been something that is not easy to grab -- grasp for a lot of people." Tr. 445. He even testified that criminal justice "stakeholders" in San Diego found these statistics "confusing." Tr. 444-45. These "stakeholders" included police and prosecutors. Tr. 444. This revelation raises a natural question: if police and prosecutors couldn't understand the likelihood ratios, how can jurors be expected to?

Consequently, these stakeholders lobbied the lab for a change. As a result of the widespread confusion, the San Diego lab has had to simplify their statistics so that police and prosecutors can find them "useful." Tr. 444.

Rather than accurately lay out the competing hypotheses framed above, the bottom-line report for Mr. Ortiz simply says: "It is 5.42 times 10 to the 8th more likely to obtain the results if Francisco Ortiz is a contributor than if this person is not a contributor." Gov't Ex. 10.

This statement, at a minimum, should be excluded from trial. Indeed, Mr. Dutra agreed that it did not accurately represent the actual statistic generated by STRmix. Tr. 444-45. The simplified-but-incomplete conclusion in Exhibit 10 ignores the competing hypotheses which are necessary to give context to what the likelihood ratio actually represents.

And these specific hypotheses are key here. They depend on two critical assumptions that do not fit the evidence in Mr. Ortiz's case. First, these hypotheses are predicated upon a mixture of five contributors—no more, no less. And second, these hypotheses assume that the five contributors are both unknown and unrelated. For the reasons outlined in the prior rounds of briefing, both of these assumptions are unsound in Mr. Ortiz's case. There are ample reasons to believe there are more than five contributors and that some of those contributors are blood relatives. As Mr. Dutra stated, the resultant likelihood ratio "is not going to be right" if these assumptions are misplaced. Tr. 448.

## III.   CONCLUSION

For these reasons, this Court should exclude the results of the DNA analysis under *Daubert*, Rule 702, and Rule 403.

Respectfully submitted,

DATED: April 3, 2024           */s/ Theo Torres*
                              Federal Defenders of San Diego, Inc.
                              Attorneys for Mr. Ortiz
                              Email: Theo_Torres@fd.org

9